## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SAMANTHA PETTINGILL, JULIE PETTINGILL, GENE PETTINGILL, JULIE PETTINGILL, as guardian *ad litem* for C. P. and T. P., minors, and SOCIETY FOR PET ADOPTION, RESCUE, AND EDUCATION, INC., a Delaware nonprofit corporation, | C.A. No. 05-224 |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| JOHN CALDWELL, in his official and individual capacities, JOHN SAVILLE, in his official and individual capacities, DELAWARE SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, a Delaware corporation | |
| Defendants. | |

## FIRST AMENDED COMPLAINT

### *Nature of Action, Jurisdiction & Venue*

1.      This is an action under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and common law malicious prosecution, intentional infliction of emotional distress, defamation and conversion. As alleged with greater particularity below, Defendants violated the individual Plaintiffs' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and federal law when they willfully and wantonly submitted false and misleading affidavits in support of applications for a search warrant and arrest warrants.  Defendants conspired to violate the Plaintiffs' rights.

2.      As a result of Defendants' actions, Plaintiffs have suffered substantial monetary damages, as well as damage to their reputation, and emotional distress damages.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

*Parties*

5.      Plaintiff Samantha Pettingill is an adult resident of the State of Delaware.

6.      Plaintiff Julie Pettingill is an adult resident of the State of Delaware.

7.      Plaintiff Gene Pettingill is an adult resident of the State of Delaware.

8.      Plaintiff C. P. is a minor resident of the State of Delaware and child of Julie and Gene Pettingill.

9.      Plaintiff T. P. is a minor resident of the State of Delaware and child of Julie and Gene Pettingill.

10.      Plaintiff Society for Pet Adoption, Rescue, and Education, Inc. is a Delaware nonprofit corporation.

11.      Defendant John Caldwell ("Caldwell") is the Executive Director of Defendant Delaware Society for the Prevention of Cruelty to Animals.  At all relevant times, Defendant Caldwell was the agent and employee of Defendant Delaware SPCA.  By virtue of his position, the acts of Defendant Caldwell represent the official policy of Defendant Delaware SPCA.

12.      Defendant John Saville ("Saville") is an Animal Control Officer for Defendant Delaware Society for the Prevention of Cruelty to Animals.  At all relevant times, Defendant Saville was the agent and employee of Defendant Delaware SPCA and was acting under the direction of Defendant Caldwell.

13.    Defendant Delaware Society for the Prevention of Cruelty to Animals ("Delaware SPCA") is a Delaware corporation, which serves as its own registered agent.   Service of process may be made upon the SPCA at Route 7, Stanton-Christiana Road, Stanton, Delaware.

*Facts Common to All Counts*

Plaintiffs' History of Rescuing and Caring for Animals

14.    In December 1994, when Samantha Pettingill was raising show hamsters, she first began taking in unwanted hamsters and placing them in new homes.  As she made more contacts among other small animal rescuers, her efforts slowly evolved to include gerbils, guinea pigs, rabbits and other small pets.  Between 1994 and 2000, Samantha Pettingill's organization, Hamster Rescue, placed over 200 small animals in new homes.

15.    In the spring of 2000, the Pettingills accepted the first unwanted cats for placement in new homes.  In the fall of 2000, the Pettingills accepted the first unwanted dogs for placement in new homes.  The Pettingills changed the name of their organization from Hamster Rescue to Savannah All-Breed Rescue (SABRE) in October 2000 to reflect the wider range of service.  In the first year of all-breed work, SABRE took in 12 dogs and 15 cats.

16.    In 2000, Samatha Pettingill began studying pre-veterinary medicine in the honors program at the University of Delaware.  Samantha was awarded two scholarships.  Samantha had taken time off to perform her rescue activities.  She was scheduled to return the fall of 2003, but was unable to because of defending against Defendants' actions.  Samantha lost the scholarships as a result of Defendants' actions.

17.    On October 16, 2001, Samantha and Julie Pettingill went to Delaware SPCA's animal shelter in Stanton, Delaware.  The Pettingills explained that they were a rescue organization and provided the Delaware SPCA with printed information on their organization.

The Pettingills also advised that the organization was a member of Petfinder, an online service for shelters and rescue organizations to list adoptable animals. The Pettingills asked if any animals were close to being euthanized. The Delaware SPCA advised that a Bernese Mountain dog mix, named Lex, was scheduled to be euthanized that afternoon. The Pettingills paid the full adoption fee and signed the dog out as a rescue. Thus began the relationship between the Pettingills and the Delaware SPCA.

18.     The Delaware SPCA continued to provide animals to the Pettingills to adopt out through their organization, SABRE. The Pettingills visited the shelter several times weekly from October, 2001 to May, 2002 and nearly every day from May, 2002 to April, 2003. SABRE placed animals in new homes through Petfinder, and through adoption events at PETCO, Concord Pet Foods & Supplies stores, and Michael Gallagher Jewelers.

19.     In April of 2002, the Pettingills incorporated the organization with the name Society for Pet Adoption, Rescue, and Education, Inc. or "SPARE". The Pettingills were the heart of SPARE. Julie and Samantha Pettingill were two of the seven board members.

20.     In June of 2002, SPARE sought nonprofit, 501(c)(3) status from the Internal Revenue Service so that SPARE could utilize the adoption center in the PETsMART store in Dover. SPARE received notification of approval of its nonprofit status on July 5, 2002 and moved into the adoption center on July 19, 2002.

21.     The adoption center is a small room in the store fitted with plexiglass fronted cat cages. Because the Pettingills had a very reliable means of placing cats, the Pettingills began taking at least a dozen cats a month from the Delaware SPCA. To care for the increased number of cats, the Pettingills purchased two sizes of dog crates, comparable in size to the two sizes of Delaware SPCA cages, to house the cats until they were ready to go to the center.

22.     In October of 2002, the Delaware SPCA began offering the Pettingills large numbers of sick cats.  One day when the Pettingills arrived to pick up two cats, they were begged to take twelve.  One of the twelve was too sick to stand and only lived for two days despite antibiotic treatment.  The Pettingills developed a treatment plan for upper respiratory infections with their veterinarian – the treatment plan included antibiotics, decongestants and subcutaneous fluids.  At this point, the Pettingills purchased ten additional small cages to isolate sick cats.  In November of 2002, a major epidemic of upper respiratory infection went through the Delaware SPCA.  The Delaware SPCA generally does not provide veterinary care.  The Pettingills took 27 sick cats from the Delaware SPCA in November.  Of those, only four were too sick to recover.  The animals provided to the Pettingills by the Delaware SPCA received veterinary care.  The Pettingills had a standing appointment every week with their veterinarian and paid substantial veterinary bills for treatment.

23.     SPARE and the Pettingills were averaging six to eight adoptions per week at the PETsMART adoption center.  By January 2003, SPARE had 21 foster homes and approximately 20 volunteers that assisted with the website, the adoption center or adoption events.  Many of the volunteers donated substantial time to SPARE.

24.     Just prior to the unconstitutional and tortious actions of Defendants beginning in April, 2003, SPARE was the second-largest no-kill animal organization in Delaware.  SPARE received no money from local, state or federal governments.  Instead, SPARE relied entirely on small donations, adoption fees and unpaid volunteers.  SPARE was the only group in Delaware, and one of only a handful in the Northeast, to work with all common pet species: dogs, cats, rabbits, ferrets, guinea pigs, hamsters, gerbils, chinchilla, mice, rats, birds (parrots and softbills), and reptiles (such as iguanas).  SPARE and the Pettingills had excellent reputations in the

community.   SPARE was known and admired across the State and the Mid-Atlantic region.

Defendants' animosity to rescue organizations

25.     Defendants bear animus to animal organizations that have a "no kill" policy.

Defendant Caldwell stated to Samantha Pettingill that adoptions were an "inconvenience."

Events Immediately Prior to April 21, 2003

26.     On April 8, 2003, the Delaware SPCA requested that the Pettingills take eight cats

who were about to be euthanized.  All had been at the shelter for at least five days, and most had

been sick for at least three days without treatment.  Several had feline rhinotracheitis or

calicivirus, severe respiratory viruses that carry a high mortality rate.  As an example: one cat,

"Hannah," taken from the SPCA at about the same time and fostered by Michael and Kathy

Gallagher was hospitalized at Windcrest Animal Hospital soon after.  Although Hannah received

extensive treatment to help alleviate the symptoms, she still died.

27.     The Pettingills immediately began treating the eight cats aggressively using the

treatment plan developed with Dr. Jackson.  Two of these cats died within five days, another

died the night of April 20, and one is said to have died at the Delaware SPCA sometime between

April 23 and April 28.  Another of the cats was still symptomatic and receiving treatment as of

April 21.  The rest of the cats had recovered by then, and a couple had even been moved to the

PETsMART adoption center a few days before.

28.     On April 11, 2003, the Pettingills had appointments at the Delaware SPCA to

have seven cats neutered.  Samantha and Julie Pettingill dropped the cats off the afternoon before

and Gene Pettingill picked the cats up the morning after the surgery.  One of the veterinary

technicians ("vet techs") advised Gene Pettingill that one of the cats, a male recently acquired

from the Delaware SPCA named Sylvester, had passed a few tapeworm fragments overnight. The Pettingills gave the cat dewormer medication and adopted out the cat on April 14, 2003.

29.    On April 15, 2003, Julie Pettingill and Samantha Pettingill took three cats to the Delaware SPCA to be neutered. The Pettingills dropped the cats off at approximately 9:00 a.m. and walked around the shelter, even though the shelter was not yet open to the public, looking for other potential rescue animals.

30.    At the same time that the Pettingills were at the Delaware SPCA, Defendant Saville was at the Pettingills' house allegedly investigating a report of a dog bite. When the Pettingills returned home at approximately 10:30 a.m., they saw a note from Defendant Saville taped to the outside of their storm door. The note said, "Please contact me ASAP about your dog biting someone. The dog must be quarantined and I need to see rabies and license information." In fact, the dog in question was not the Pettingills' dog. A fact that Defendant Saville admitted when Samantha Pettingill immediately called him.

31.    Samantha Pettingill called the Delaware SPCA that afternoon at about 3:30 p.m. to determine whether they could pick up the neutered cats. She was told that the vet tech had gone home, that no one could talk to her about the cats and that there had been a problem.

32.    The following morning, April 16, 2003, Samantha Pettingill called the Delaware SPCA and spoke to a vet tech, Danica Wizeniewski, about the problem. The vet tech told Samantha that one of the cats did not wake up after surgery. The vet tech said that since Pam Horak, the other vet tech, had been out sick, she had been stretched too thin to monitor all the cats as they awakened. The Pettingills picked up the other two cats later that morning.

33.    On April 17, 2003, Defendant Saville, with the approval and concurrence of Defendant Caldwell, submitted an application for a search warrant for the Pettingill home.  A search warrant was issued by Magistrate Judge Campbell at 1:36 p.m. on April 17, 2003.

34.    Later that afternoon at approximately 4:00 p.m., Julie and Samantha Pettingill went to the Delaware SPCA shelter.  The Delaware SPCA requested that the Pettingills take four cats, which the vet tech stated were ill and were scheduled to be euthanized.  The Pettingills took all four cats.  Three cats were actually healthy. One of the cats was severely ill.  The Pettingills immediately began treating the ill cat with antibiotics, eyedrops and a decongestant.  As of April 21, 2003, the cat was still ill, but was no worse than when the Delaware SPCA gave her to the Pettingills.  The Pettingills had a vet appointment the evening of April 21 and would have taken this cat.

35.    On April 19, 2003, Julie and Samantha Pettingill went to the Delaware SPCA shelter.  The Delaware SPCA requested that the Pettingills take four kittens that were too young to adopt, keep them for a week, and then return them to the SPCA.  The Pettingills took the four kittens.

36.    In the twelve days prior to April 21, 2003, the Delaware SPCA had given the Pettingills and SPARE 16 cats.  After obtaining the search warrant in the early afternoon of April 17, 2003, the Delaware SPCA gave the Pettingills and SPARE 8 cats.  Out of the four "sick" cats given to the Pettingills and SPARE late on April 17, 2003, the Pettingills were charged with cruelty in connection with three of them on the basis that they were ill and not being treated. However, Defendant Caldwell refused to accept any records detailing treatment of any of the animals.

37.     On April 20, 2003, Easter Sunday, Samantha Pettingill performed the morning animal care (feeding, watering, medicating, and cleaning) in the morning prior to the egg hunt for the young Pettingill children.  The family went to Cracker Barrel in Elkton, Maryland that evening.  The family returned home at approximately 8:00 p.m., and the young Pettingill children were put to bed.  Samantha Pettingill then performed the evening animal care (feeding the dogs, checking the food and water for the foster cats in the basement, feeding and watering all the small animals in the upstairs of the house, and medicating several foster cats that were still under treatment for upper respiratory infections).  One of the foster cats that had been ill when the Delaware SPCA provided it to the Pettingills on April 8, 2003 and had not been responding to treatment, died at about midnight.  Because Gene Pettingill had already gone to sleep and because he usually handled disposal of deceased animals, Samantha Pettingill removed the cat from the cage and placed it on the basement floor.  No other animals could have any contact with the body of the deceased cat.

38.     The Pettingills provided, at substantial expense, appropriate food, water, shelter, medication and other care to all the animals that they owned personally or that they were fostering on behalf of SPARE.

Events of April 21, 2003

39.     On April 21, 2003 at approximately 9:00 a.m., Julie Pettingill and Samantha Pettingill were awakened by repeated ringing of their doorbell.  There were two SPCA trucks parked in front of their house.  The Pettingills were confused, and Samantha Pettingill called a Delaware SPCA employee to find out what was going on.  Samantha was told that the employee was not available.  Samantha dressed and went downstairs and went outside through the garage.  She was met by Defendant Saville, Jack Renaud, another animal control officer, and Debbie

Phillips and Charles Wilson from New Castle County.  Defendant Saville stated that they wanted

to inspect the house, but made no mention of the search warrant.  Samantha Pettingill went inside

to get her mother.  Samantha went up to the bedroom to get her mother.  When she returned

downstairs, Defendant Saville had already entered the house, and the others were following him.

Only at that point, did Defendant Saville present Samantha Pettingill with the search warrant.

40.    The young Pettingill children were awakened by the commotion caused by

Defendants.  The young Pettingill children were confused and scared, as were Julie and

Samantha Pettingill.

41.    Defendant Saville, Renaud, Phillips and Wilson quickly looked through the

house.  Defendant Saville determined that they would be seizing all the animals and radioed the

Delaware SPCA for additional persons.  Defendant Saville contacted Delaware SPCA to ask

whether the Division of Family Services should be contacted and Defendant Saville was told that

they should be.  Defendant Saville commented that Defendant Caldwell would want to come to

the house.

42.    Julie Pettingill called Gene Pettingill at work and told him to come home.

43.    Defendant Caldwell arrived at the Pettingill home at approximately 9:40 a.m.  The

media was not far behind.  Defendants then began to put on a show for the media.  Defendant

Caldwell donned a face mask to enter the home.  The only other person to wear a face mask that

day was an animal control officer who put it on briefly when the media first arrived.

44.    Defendants took all the animals out of the house and lined them up on the lawn.

The Defendants did not allow the dogs out of their crates as they were being carried out.

Because the dogs were normally taken outside to urinate and defecate in the morning, the dogs

were frantic to get out of the crates.  As the cats that had been in cages were carried out, their

food, water and litter sloshed about the cages. For the cats that had not been in cages, the Delaware SPCA roughly shoved them into carriers – sometimes two in a carrier designed for one. Defendants did not summon a veterinarian to care for any of the allegedly cruelly neglected animals.

45.     Samantha Pettingill and Gene Pettingill spoke to Defendant Caldwell. Gene Pettingill attempted to explain their rescue activities, stated that the animals received regular veterinary care, and offered to provide the veterinary records. Defendant Caldwell stated that the records were important and that Defendants would not bring charges for any animals that the Pettingills could show were under veterinary care. Gene Pettingill offered to go to get the records or have someone else bring them immediately. Defendant Caldwell said not to worry, that he didn't need them yet, and would let the Pettingills know as soon as he did need them.

46.     Samantha Pettingill was prohibited from providing any animals their morning food, water and medication. The Delaware SPCA did not provide any of the animals water until many hours later after the media complained. Then, the Delaware SPCA provided some dogs water. The Delaware SPCA did not provide any of the other animals any food, water or medication before leaving the Pettingill property. The Delaware SPCA did not leave the Pettingill property until approximately 4:00 p.m.

47.     As a result of the Defendants' actions, Plaintiffs' home was improperly condemned on April 21, 2003 at approximately 10:00 a.m. The condemnation was lifted soon thereafter.

48.     Additionally, as a result of the Defendants' actions, at approximately 11:00 a.m. Gene Pettingill and Julie Pettingill's two young children were taken into the custody of the DFS and Plaintiff Gene Pettingill and Julie Pettingill were taken into police custody and each charged

11

with two counts of Endangering the Welfare of a Child.  The children were returned to the custody of Plaintiffs Gene Pettingill and Julie Pettingill two weeks later and the charges of Endangering the Welfare of a Child were dismissed by the State of Delaware on the basis of lack of prosecutorial merit.

49.     At approximately noon on April 21, 2003, Defendant Caldwell spoke to Samantha Pettingill.  He pressured her to sign over all the animals to the Delaware SPCA and advised that "this will all go away, if you do."

50.     At around that time, the burglar alarm began to sound even though it had not been activated.  The alarm does contain a "prowler" button which sets off the alarm at a touch.  The alarm company called, and Samantha Pettingill provided the private code to end the alarm. Although the alarm did not provide fire service, a fire truck mysteriously appeared approximately 20 minutes later.  The firemen immediately went to Defendants Caldwell and Saville.  Defendant Caldwell requested that the fireman place a fan on the porch.  The firemen did so.  They remained approximately 30 minutes.  The lights, sirens and fan merely added to the spectacle.

51.     Defendant Caldwell then held a mini-press conference on the Pettingills' front lawn.  Defendant Caldwell made numerous statements regarding the Pettingills.  This was just the first of many statements Defendant Caldwell made to the press.  Many of the comments were made with the knowledge that they were false or with a reckless disregard for the truth.

52.     At approximately 1:00 p.m., the Defendants had finished removing the animals from the house.  Although the animals were not provided any food, the Defendants stopped work and ate lunch.

53.     The Defendants then loaded the animals into a number of trucks, including one hauling a horse trailer.  The Defendants left the Pettingill property with the animals at approximately 4:00 p.m.  According to the search warrant return, the Defendants seized a total of 146 live animals, including 22 dogs, 22 birds, 4 rabbits, 9 hamsters, 3 ferrets, 4 lizards, 1 rat, 2 girds, 2 gerbils, 8 chinchillas, 1 turtle, 2 fish and 66 cats.  The Defendants also seized approximately 70 assorted cages, aquariums and carriers, including their contents of bowls, towels, etc.

54.     Samantha secured the house and drove to the police station to pick up her parents.  When she arrived, the media swarmed her car.  Julie and Gene Pettingill were released and the Pettingills drove home.  The Pettingills collected their belongings and drove to a hotel.  As they were leaving, the Action News crew was still parked in front of the house with a high-powered spotlight aimed at the front door.

Events after April 21, 2003

55.     The Pettingills' and SPARE's nightmare did not end on April 21.  The news media continued to report statements made by the Defendants about the Pettingills and SPARE.  The Pettingills and SPARE received very disturbing "hate mail."  The Pettingills' reputation was destroyed, as was the reputation of SPARE.

56.     On April 30, 2003, the Pettingills were each charged with 44 counts of Cruelty to Animals, 1 count of Conspiracy in the Third Degree, and 17 charges related to ventilation, housekeeping and enclosures (collectively the "Cruelty to Animals charges").  The affidavit submitted by Defendant Saville in support of the arrest warrants contained false and misleading statements.  The magistrate judge would not have issued the arrest warrant except for Defendant Saville's false and misleading affidavit.

57.    The Pettingills were forced to hire, at a substantial expense, three separate attorneys to defend themselves against the Cruelty to Animals charges that were later dismissed by the State of Delaware.

58.    The Pettingills were forced to pay the Delaware SPCA to board their animals until the charges against them were dismissed by the State of Delaware.

59.    The Pettingills were subjected to random searches of their home as a condition of bail so that they could receive back some of the animals that were not subject to charges. The Pettingills had to fight to receive back other animals that did not have charges. The Court of Common Pleas ordered the Delaware SPCA to return animals for which there were no criminal charges. To date, the Delaware SPCA has not returned all the animals listed in the Court's Order. As a demonstration of his contempt of the Court's Order requiring him to return the animals, Defendant Caldwell ripped up the Court's Order at a meeting at the Department of Justice on November 17, 2004. The animals that were the subject of the cruelty to animal charges were not returned by the Delaware SPCA until December 2 and 3, 2004.

60.    Regardless of whether the animals were only in the custody of the Delaware SPCA for 2 weeks or for almost 20 months, many were returned with serious health problems that indicated a lack of proper care and medical treatment while in the custody of the Delaware SPCA. Some of the animals died while in the custody of the Delaware SPCA. 22 animals, including 18 personal pets and 4 rescue animals, are known to have died while in the custody of the Delaware SPCA.

61.    Upon Order of the Court of Common Pleas, the Delaware SPCA was required to allow the Pettingills to have a veterinarian examine their animals in the custody of the Delaware SPCA. The Pettingills veterinarian, Dr. Ann Jackson, examined the animals on June 24, 2004.

She found various medical problems with the animals, some being treated and some not, and prescribed treatment for the animals. Some of her treatment recommendations were ignored. In the case of one cat, Ra, this lead to the animal's death.

62.    The Pettingills and SPARE were forced to endure extreme pressure from the Defendants to sign all the animals over. Additionally, the Pettingills and SPARE were tricked and deceived into signing over certain animals. On June 30, 2003, Julie and Samantha Pettingill went to the Delaware SPCA to sign over certain uncharged foster animals so that they could be taken to the Delaware Humane Association for adoption. After signing the papers for those animals, Defendant Caldwell presented Julie Pettingill with a paper and told her if she signed it, she could have her personal pet, Zoe, a Wire Fox Terrier dog back. Julie Pettingill signed the paper. Defendant Caldwell took the paper to another Delaware SPCA employee who then wrote on it that Zoe was signed over to the Delaware Humane Association. Defendant Caldwell then laughed and said, "you just signed over your dog, she's going to the Delaware Humane Association."

63.    As a direct result of Defendants' actions, SPARE lost the ability to use the PETsMART adoption center, lost the value of property located at the PETsMART adoption center, lost the value of adoption fees for animals that would have been adopted out, and lost the ability to continue its previously successful rescue operation.

Search Warrant was Improperly Granted and Search was Illegal – Charges Dismissed

64.    On July 12, 2004, the Court of Common Pleas held an evidentiary hearing to determine whether the search warrant was properly issued. As the Court noted in its opinion, "Officer Saville candidly admitted that several of the facts that he provided in the affidavit [in support of the request for a search warrant] were false and misleading. . . . Officer Saville also

admitted that many important facts were left out of the affidavit. There was no mention of the fact that the Defendants had adopted hundreds of animals from the SPCA in the past two years nor that they were in regular contact with the SPCA. There is nothing in the affidavit to indicate that there were in fact animals actually inside the Defendants' residence, let alone animals in need of immediate care. His affidavit also lacks any kind of information as to the cause of death of one of the cats brought to the SPCA for neutering on the day he first visited the Pettingill residence." Defendant Saville also did not mention that the Pettingills were part of SPARE, an incorporated non-profit organization that occupied the PETsMART adoption center. The Court concluded that Defendant Saville's false and misleading affidavit was insufficient for the warrant to be issued. The magistrate judge would not have issued the search warrant except for Defendant Saville's false and misleading affidavit.

65.    The training provided by and policies of Defendant Delaware SPCA and Defendant Caldwell caused Defendant Saville to submit the false and misleading affidavits.

66.    The State of Delaware dismissed all charges against each of the Pettingills on or about December 2, 2004.

67.    In March, 2005, the Pettingills picked up the equipment that the Defendants were returning from that which had been seized. Most of the equipment was not returned. Much of the equipment that was returned is in deplorable condition.

68.    On March 21, 2005, the Defendants refused to provide medical records for treatment that the Pettingills' animals received while in custody of the Delaware SPCA, despite the fact that the Pettingills paid for any such treatment.

## *Count I - 42 U.S.C. § 1983*

### *Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill, and Julie Pettingill, as guardian ad litem for C. P. and T. P., minors*

69.    Plaintiffs incorporate and reallege paragraphs 1 through 68 as if fully set forth herein.

70.    Defendants violated the provisions of 42 U.S.C. § 1983 in that, acting under the color of law, they deprived the Plaintiffs of their rights, privileges and/or immunities as provided by, among other provisions, the Fourth Amendment to the United States Constitution, by entering and searching Plaintiffs' home without permission, without a valid warrant, without probable cause and after providing false and misleading statements so that a magistrate improperly issued a warrant.

71.    Defendants violated the provisions of 42 U.S.C. § 1983 in that, acting under the color of law, they deprived the Plaintiffs Samantha Pettingill, Julie Pettingill and Gene Pettingill of their rights, privileges and/or immunities as provided by, among other provisions, the Fifth Amendment to the United States Constitution, by arresting Plaintiffs without probable cause and after providing false and misleading statements so that a magistrate improperly issued a warrant.

72.    Defendants acted willfully and wantonly.

73.    As a direct and proximate result of the Defendants' actions, Plaintiffs have suffered substantial monetary damages, as well as damage to their reputation, and emotional distress damages.

### *Count II – 42 U.S.C. § 1985(3)*

### *Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill, and Julie Pettingill, as guardian ad litem for C. P. and T. P., minors*

74.    Plaintiffs incorporate and reallege paragraphs 1 through 73 as if fully set forth herein.

75.    Defendants violated the provisions of 42 U.S.C. § 1985(3) by willfully and wantonly conspiring to violate Plaintiff's constitutional rights.

### *Count III - Malicious Prosecution*

### *Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill*

76.    Plaintiffs incorporate and reallege paragraphs 1 through 75 as if fully set forth herein.

77.    Criminal judicial proceedings were instituted against Plaintiffs.

78.    The criminal judicial proceedings were by or at the instance of Defendants.

79.    The criminal judicial proceedings terminated in favor of Plaintiffs.

80.    Defendants acted with malice in instituting the criminal judicial proceedings.

81.    There was a want of probable cause for the institution of the criminal judicial proceedings.

82.    As a direct and proximate result of the criminal judicial proceedings, Plaintiffs have suffered substantial monetary damages, as well as damage to their reputation, and emotional distress damages.

### *Count IV – Intentional Infliction of Emotional Distress*

***Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill, and Julie Pettingill, as guardian ad litem for C. P. and T. P., minors***

83.     Plaintiffs incorporate and reallege paragraphs 1 through 82 as if fully set forth herein.

84.     Defendants' actions towards Plaintiffs were extreme and outrageous.

85.     Defendants acted intentionally or recklessly.

86.     As a direct and proximate result of the Defendants' actions, Plaintiffs have suffered severe emotional distress.

### *Count V – Defamation*

***Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill and Society for Pet Adoption, Rescue, and Education, Inc.***

87.     Plaintiffs incorporate and reallege paragraphs 1 through 86 as if fully set forth herein.

88.     Defendants made statements to third persons about Plaintiffs that adversely affected Plaintiffs' reputations.  The statements adversely reflected on Plaintiffs' conduct in their business or profession.

89.     As a direct and proximate result of Defendants' defamatory statements, Plaintiffs have suffered substantial monetary damages, as well as damage to their reputation, and emotional distress damages.

### *Count VI – Conversion*

***Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill and Society for Pet Adoption, Rescue, and Education, Inc.***

90.     Plaintiffs incorporate and reallege paragraphs 1 through 89 as if fully set forth herein.

91.     Defendants wrongfully interfered with Plaintiffs' right of possession of their animals and cages, aquariums and carriers, including their contents of bowls, towels, etc. (collectively "Property") by seizing and wrongfully detaining them.

92.     Defendants intended to seize and detain the Plaintiffs' Property.

93.     Defendants have not returned all of Plaintiffs' Property.  That which Defendants returned was, in the case of some animals, in poor health and/or after the useful breeding life, and, in the case of some cages, aquariums and carriers and their contents, in damaged condition.

94.     Plaintiffs are entitled to recover the Property that Defendants still possess and/or are entitled to fair market value of the Property at the time of Defendants' conversion.

**WHEREFORE,** Plaintiffs Samantha Pettingill, Julie Pettingill, Gene Pettingill and Julie Pettingill, as guardian ad litem for C. P. and T. P., minors pray that the Court:

a.     Enter judgment in their favor and against Defendants, jointly and severally;

b.     Enter a declaratory judgment declaring the acts of the Defendants to be a violation of Plaintiffs' rights;

c.     Enter a judgment against the Defendants, jointly and severally, for nominal or presumed damages, compensatory damages, special damages and punitive damages;

d.     Enter judgment against Defendants, jointly and severally, for Plaintiffs' attorneys' fees, costs and expenses for this suit;

e.     Enter a judgment against Defendants, jointly and severally, for pre- and post-judgment interest;

f.     Issue a permanent injunction enjoining the Defendants from violating Defendants' rights, requiring Defendants to undergo training and counseling on their obligations under the

United States' Constitution, and requiring appropriate reporting to the court of steps taken to eliminate past or future discrimination.

       g.      Require such other and further relief as may be just and proper under the circumstances.

OBERLY, JENNINGS & RHODUNDA, P.A.


Dated: April 21, 2005              /s/ Karen V. Sullivan
                       Charles M. Oberly, III (No.743)
                       Karen V. Sullivan (No. 3872)
                       800 Delaware Avenue, Suite 901
                       P.O. Box 2054
                       Wilmington, DE 19899
                       (302) 576-2000 – Telephone
                       (302) 576-2004 – Facsimile

                       Attorneys for Plaintiffs