# HECKLER & FRABIZZIO

ATTORNEYS AT LAW

THE CORPORATE PLAZA

800 DELAWARE AVENUE

SUITE 200

POST OFFICE BOX 128

WILMINGTON, DELAWARE 19899-0128

GEORGE B. HECKLER, JR.
ANTHONY M. FRABIZZIO
MARIA PARIS NEWILL
RICHARD D. ABRAMS
WILLIAM D. RIMMER*
DANIEL P. BENNETT
JOHN GILBERT*
DAVID R. BATMAN
JOHN W. MORGAN
TIMOTHY H. ROHS
MIRANDA D. CLIFTON
CHERYL A. WARD
STEPHEN J. MILEWSKI
CASEY W. LESIAK*
ROBERT J. DEARY*

AREA CODE 302
573-4800

TELECOPIER
573-4806

*DELAWARE AND PENNSYLVANIA BAR
*PENNSYLVANIA BAR ONLY

June 13, 2006
Refer to:  PI05-16092

**HAND DELIVER**

The Honorable Susan L. Robinson
U.S. District Court
844 N. King Street
Wilmington, DE  19801

RE:    Pettingill, et al. v. Delaware SPCA, et al.
       C.A. No. 05-224

Your Honor:

Pursuant to the Court's Order dated May 16, 2006, and my requested extension of June 6, 2006, please allow the following to serve as Defendant Delaware SPCA's memorandum in support of its non-disclosure of the SPCA Board of Directors' meeting minutes as they pertain to conversations regarding the Plaintiffs.

As the Court is aware, this case arises from a search and seizure of animals from the Pettingill residence by the Delaware SPCA on April 21, 2003.  Through discovery, the Plaintiffs attempt to obtain all meeting minutes from the Delaware SPCA from January 2001 through the present to ascertain whether any discussions occurred regarding the Pettingills.  The Delaware SPCA maintains that all communications with respect to the Pettingills at the Board of Directors' level is protected by either the attorney/client privilege and/or the work product doctrine.

The Board of Directors meeting minutes do not reflect any conversations regarding the Plaintiffs until May 2003, following the search and seizure at the residence, and the institution of criminal action by the State of Delaware against the Pettingills.  After such time, all discussions at the Board of Directors' level involved John Caldwell, the Director of the SPCA, reporting to the Board the status of the litigation and opinions regarding such litigation.

The Honorable Sue L. Robinson
June 13, 2006
Page 2

Pursuant to Federal Rules of Civil Procedure Rule 26(b)(3):

> ... A party may obtain discovery of documents and tangible
> things otherwise discoverable under subdivision (b)(1) of
> this Rule and prepared in anticipation of litigation or for trial
> by or for another party or by or for that other party's
> representative (including the other party's attorney,
> consultant, surety, indemnitor, insurer, or agent) only upon
> a showing that the party seeking discovery has substantial
> need of the materials in preparation of the party's case and
> the party is unable without undue hardship to obtain a
> substantial equivalent of the materials by other means.

What is clear from the Federal Rule (which is identical to the Delaware Civil
Rule) is that the work product doctrine extends beyond those materials prepared by an
attorney, or at the request of an attorney. The Delaware Superior Court has cited, with
approval, Moore's Federal Practice which states that "the technical distinction between
materials prepared by an attorney and those obtained by a claim agent or other
representative of the party from whom discovery is sought has been eliminated."
Mullins v. Vakili, 506 A.2d 192, 196 (Del. Super. 1986). What is necessary for documents
prepared by non-attorneys is that those documents be prepared in anticipation of
litigation. U.S. Bank National Association v. U.S. Timberland's Klamath Falls, L.L.C.,
C.A. No. 112-N, Lamb, V.C. (Del. Ch., August 16, 2005) (attached).

In this instance, all communications at the Board of Directors' level regarding the
Pettingills after May 2003 was concerning litigation involving the Pettingills. Therefore,
not only was it "in anticipation of litigation," but litigation had already been
commenced. As the Third Circuit has previously held, "the literal language of Rule
26(b)(3) requires that the material be prepared in anticipation of some litigation, not
necessarily in anticipation of the particular litigation in which it is being sought." In re:
Ford Motor Company, 110 F.3d 954, 967 (3d Cir. 1997). The early communications
shared with the Board involved the litigation against the Pettingills brought by the
Attorney General's Office. Information was shared with respect to that litigation.
Although the Delaware SPCA was not a party to the litigation, they shared a common
interest in the litigation. The common interest exception protects those communications
when persons sharing a common interest share work product, that are reasonably
expected to be kept confidential. Saito v. McKesson HBOC, Inc., C.A. No. 18553,
Chandler, C. (Del. Ch., November 13, 2002) (attached). As the Court notes in the
opinion:

The Honorable Sue L. Robinson
June 13, 2006
Page 3

> I know of no good reason why an opponent should borrow
> the wits of its adversary simply because that adversary was
> cooperating with a law enforcement agency.

Similarly, the Chancery Court concluded that communications originating from non-attorneys can be protected by the attorney/client privilege, if those communications relay legal advice from counsel to party with a common interest. U.S. Bank National Association v. U.S. Timberland's Klamath Falls, L.L.C.. C.A. No. 112-N, Lamb, V.C. (Del. Ch. August 16, 2005).

Based upon the above, the initial communications with the Board regarding the Pettingill matter are protected by the work product doctrine and the common interest privilege. All discussions with the Board after April 19, 2005 concerned the contempt of court hearing filed by the Pettingills against John Caldwell and the Delaware SPCA. Clearly, those communications were protected by the work product doctrine and the attorney/client privilege. They were made during the course of litigation against Mr. Caldwell and the Delaware SPCA. Most of the notes reflect the status of the litigation, and communications with the Delaware SPCA's attorney, Donald Gouge, Esquire.

Attached please find the privilege log for the communications reflected in the Board of Director's meeting minutes from May 2003 through April 2006. These meetings are private meetings of the Delaware SPCA Board of Directors, and only members of the Board of Directors are in attendance. Likewise, it is my understanding that the minutes are only disseminated to the Board of Directors. As with any Board of Directors, confidentiality is expected. To allow the Plaintiffs to discover notes of discussions with respect to pending litigation creates an environment which would discourage the open discussion of pending litigation among a corporation's Board of Directors. Obviously, the best interests of a well run corporation, or any other entity, is that the Board of Directors be kept apprised of pending litigation, successes and failures in that litigation, and strategy for the future. These discussions taken place, not in anticipation of litigation, but because of the litigation.

Defendants are willing, if required, to address each note for which a protection is claimed, and are willing to submit such documents for an in camera review by the Court. In addition, the Defendants continue to attempt to work with Plaintiffs' counsel with respect to all outstanding issues concerning the discoverability of the notes from the meetings.

The Honorable Sue L. Robinson
June 13, 2006
Page 4

  If the Court has any questions, requires further information, counsel is available at the Court's convenience.

       Very truly yours,

       DANIEL P. BENNETT

DPB/bst/296637
cc: Karen Sullivan, Esquire
   Oberly, Jennings & Rhodunda, P.A.
   1220 N. Market Street, Suite 710
   P.O. Box 2054
   Wilmington, DE 19899

**Westlaw.**

Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

**(Cite as: 2005 WL 2037353 (Del.Ch.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
U.S. BANK NATIONAL ASSOCIATION, in its capacity as Indenture Trustee and not in its individual capacity, Plaintiff,
v.
U.S. TIMBERLANDS KLAMATH FALLS, L.L.C., n/k/a Inland Fiber Group, L.L.C.; U.S. Timberlands Finance Corp. n/k/a Fiber Finance Corp., U.S. Timberlands Yakima, L.L.C., n/k/a American Forest Resources, L.L.C.; U.S. Timberlands Holdings Group, L.L.C. n/k/a Cascades Resource Holdings Group, L.L.C.; U.S. Timberlands Services Company, L.L.C., n/k/a Timber Resources Services, L.L.C.; John M. Rudey; Alan B. Abramson; Aubrey L. Cole; George R. Hornig; Robert F. Wright; and William A. Wyman, Defendants.
**No. Civ.A. 112-N.**

Submitted June 2, 2005.
Decided June 9, 2005.
Revised Aug. 16, 2005.

Daniel B. Rath, Rebecca L. Butcher, Landis Rath & Cobb LLP, Wilmington, Delaware; Jerome A. Miranowski, Kerry L. Bundy, Nathaniel Zylstra, Faegre & Benson LLP, Minneapolis, Minnesota, for the Plaintiff.

Bruce L. Silverstein, C. Barr Flinn, Karen E. Keller, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David M. Friedman, Mark P. Ressler, R. Tali Epstein, Kasowitz, Benson,

Torres & Friedman, LLP, New York, New York, for Defendants U.S. Timberlands Klamath Falls, L.L.C., n/k/a Inland Fiber Group, L.L. C., and U.S. Timberlands Finance Corp., n/k/a Fiber Finance Corp..

Bruce L. Silverstein, C. Barr Flinn, Karen E. Keller, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for Defendants U.S. Timberlands Yakima, L.L.C., n/k/a American Forest Resources, L.L.C., U.S. Timberlands Holdings Group, L.L.C., n/k/a Cascades Resource Holding, L.L.C., U.S. Timberlands Services Company, L.L.C., n/k/a Timber Resources Services, L.L.C., John M. Rudey, and George R. Hornig.

Jesse A. Finkelstein, Srinivas M. Raju, Richards, Layton & Finger, Wilmington, Delaware, for Defendants Alan B. Abramson, Aubrey L. Cole, Robert F. Wright, and William A. Wyman.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I. [FN1]

> FN1. The court recites only the facts essential to the disposition of this Motion. For a thorough recitation of the facts, please see *U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C.,* 864 A.2d 930, 935-37 (Del. Ch.2004), *vacated and remanded,* No. 36, 2005, Jacobs, J. (Del. June 6, 2005) (ORDER).

*1 This is an action by U.S. Bank National Association, an indenture trustee (the "Trustee"), seeking a declaration that the issuer of certain notes, Defendant U.S. Timberlands Klamath Falls, L.L.C. ("Klamath" or the "Issuer") violated several provisions of the notes' indenture (the "Indenture") by entering into transactions with a related

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

**(Cite as: 2005 WL 2037353 (Del.Ch.))**

third-party. The Trustee alleges that these transactions were completed to the detriment of the Issuer, and for the benefit and personal gain of other defendants. [FN2] The Trustee further alleges breach of fiduciary duty, actual and constructive fraud, and seeks the avoidance of certain transactions between the Issuer and the related entity and the imposition of a constructive trust on the property that was the subject of those transactions.

> FN2. These other defendants are U.S. Timberlands Services Company, L .L.C. ("Services"), U.S. Timberlands Finance Corp., U.S. Timberlands Holdings Group, L.L.C., and U.S. Timberlands Yakima L.L.C. All of these entities have since changed their names. Additionally, the five members of the board of directors of Services are named as individual defendants: John M. Rudey, Alan B. Abramson, Aubrey L. Cole, George R. Hornig, Robert F. Wright, and William A. Wyman. Rudey is also the chairman, CEO, and president of Services. Rudey formed Klamath in 1996.

On December 22, 2004, this court denied the defendants' motion to dismiss, and granted the Trustee's motion for partial summary judgment. [FN3] On May 3, 2005, the defendants moved to compel discovery, from the Trustee, of communications between the Trustee and QVT Financial LP and GoldenTree Asset Management, L.P., two holders of the notes (collectively, the "Noteholders"). In particular, the defendants requested an order:

> FN3. *U.S. Bank*, 864 A.2d at 934.

compelling the plaintiff to produce all documents withheld pursuant to the common interest doctrine for which no other privilege has been properly asserted; [ ] compelling the plaintiff to produce all other withheld documents for which it had not properly asserted an applicable privilege; [ ] compelling the plaintiff to produce Messrs. [Lawrence] Bell and [Scott] Strodthoff in the

State of Delaware for additional questioning related to those subjects on which they previously refused to testify based on the plaintiff's improper assertions of the common interest doctrine....

The Trustee and the Noteholders countered that these disclosures were protected by the attorney-client privilege and the work-product privilege. On June 2, 2005, the court heard oral arguments on this issue. [FN4] This is the court's disposition of that motion.

> FN4. The court also heard oral arguments on a motion to dismiss certain counterclaims brought by the defendants and a motion to compel discovery from the Noteholders. The court disposed of both of these issues at the hearing.

II.

*A. Attorney-Client Privilege And Common Interest*

The attorney-client privilege protects the communications between a client and an attorney acting in his professional capacity where the communications are intended to be confidential and the confidentiality is not waived. [FN5] The privilege serves "to foster the confidence of the client and enables him to communicate without fear in order to seek legal advice." [FN6] In Delaware, the scope of the attorney-client privilege is set out in Rule 502 of the Delaware Rules of Evidence. [FN7] The rule also extends to the protection of confidential communications involving counsel for separate clients so long as the clients share a "common interest" sufficient to justify invocation of the privilege. [FN8]

> FN5. *Moyer v. Moyer*, 602 A.2d 68, 72 (Del.1992).

> FN6. *Riggs Nat'l Bank v. Zimmer*, 355 A.2d 709, 713 (Del. Ch.1976).

> FN7. Del. R. Evid. 502(b) states that a communication is privileged if made in confidence:
> for the purpose of facilitating the rendition of professional legal services to the client

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                 Page 3

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

(Cite as: 2005 WL 2037353 (Del.Ch.))

(1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

FN8. *See Metro. Bank & Trust Co. v. Dovenmuehle Mortgage, Inc.,* 2001 Del. Ch. LEXIS 153, at *22 (Del. Ch. Dec. 20, 2001) (quotations omitted); *see also Reese v. Klair,* 1985 Del. Ch. LEXIS 403, at *15-*16 (Del. Ch. Feb. 20, 1985) ("The letters between attorneys, copies of which were sent to the appraiser, also remain confidential as communication between the attorneys of clients with common interests and the attorneys' representative.").

In this case, all the communications that the defendants seek to discover were between or among the Trustee and its counsel, and certain noteholders. In order to participate in these communications, the noteholders were required to agree that they would maintain the confidentiality of those communications, and were required to state that they did not have any connections to the defendants. Therefore, the court must decide whether there was a sufficient community of interest between the noteholders and the Trustee such that confidential communications between them and the Trustee's counsel in the course of, or for the purpose of, facilitating the rendition of professional legal services are protected by the attorney-client privilege.

*2 It is clear that the Trustee and the Noteholders share a common interest. Due to the "no-action" clause contained in the Indenture, the individual noteholders cannot sue to enforce the notes. Instead, they must first give written notice to the Trustee of

a continuing Event of Default and afford the Trustee a reasonable opportunity to exercise its powers under the Indenture, or to sue for the enforcement of the Indenture. [FN9] In addition, the no-action clause bars noteholders from bringing non-contractual claims on the notes. Instead, they must "be prosecuted by the trustees *representing* the bondholders as a group." [FN10] Furthermore, the Indenture requires that the Trustee, in the event of a default, prosecute such claims, if such action would be reasonable. [FN11] Therefore, the noteholders are required by the Indenture to rely upon the Trustee to bring suit, and the Trustee is contractually obligated to do so. It is difficult to see how the Noteholders' and the Trustees interest in prosecuting claims of this nature could be more closely aligned.

> FN9. For a thorough discussion of the no-action clause contained in the indenture, please see *U.S. Bank.,* 864 A.2d at 939-43.

> FN10. *U.S. Bank.,* 864 A.2d at 941 (quoting *Feldbaum v. McCrory Corp.,* 1992 Del. Ch. LEXIS 113, at *27-*28 (Del. Ch. June 1, 1992) (emphasis added).

> FN11. *See* Indenture §§ 6.3 & 7.1.

That being said, there are situations where their interests diverge, for example, where the Trustee seeks indemnification from the noteholders for bringing suit. In this situation, the parties' interests are actually antagonistic. Any documents containing communications relating to indemnification of the Trustee are, therefore, discoverable. However, after the Trustee made the decision to bring this suit, sometime in 2003, the Trustee's and the Noteholders' interests were clearly aligned. Therefore, otherwise privileged communications between the Trustee, its counsel, and the Noteholders after this time are not discoverable.

B. *Application Of Attorney-Client Privilege And Common Interest Doctrines To The Depositions*

The defendants have also asserted that, during the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

(Cite as: 2005 WL 2037353 (Del.Ch.))

deposition of certain witnesses, counsel for the plaintiff instructed the deponents not to respond to certain questions based on the attorney-client privilege. This included, the defendants allege, questions regarding conversations between the Trustee and the Noteholders with respect to issues where their interests were not in common, for instance questions relating to the Trustee withholding interest payments on the debentures to fund its lawsuit.

It is improper for an attorney to instruct a deposition witness not to answer a question based on the attorney-client privilege, when the question relates to information that is partially privileged, but partially not. The proper procedure is to instruct the witness not to disclose privileged information while answering the question. After reviewing the transcript of the deposition about which the defendants complain, the court is convinced that counsel for the plaintiff did not overly invoke the attorney-client privilege and that the defendants received answers to their questions, to the extent the common interest doctrine was not implicated.

When counsel for the defendants questioned the deponent as to issues where the Trustees and Noteholders had divergent interests, counsel for the plaintiff did not instruct the deponent to refuse to answer entirely, as the defendants contend. Instead, counsel for the plaintiff simply instructed the deponent to not reveal privileged communications while answering. The following exchange is typical of what occurred.

*3 Q (By Mr. Flinn) Did any note holder at any time ever voice to the Trustee any concern about the possibility of or [sic] Trustees having withheld interest?

MR. MIRANOWSKI: I'm going to instruct you not to answer to the extent it discloses communications in the presence of Counsel.

A I talked to note holders who had questions about the withholding of the interest payments.

Q (By Mr. Flinn) What note holders were those?

A Some of them were the note holders we've already referred to such as Oppenheimer and Golden Tree [sic] and QVT. As a result of the withholding the interest, there were a number of

individual holders who identified themselves to us at that time.

Q Who were the individual holders?

A I'm sorry, I can't remember their names. [FN12]

> FN12. Bell Dep. of Mar. 31, 1995 at 209-10.

The court finds that counsel for the plaintiff did not act improperly in instructing the deponent. The court further finds that the defendants were able to receive responsive answers to their questions, when the attorney-client privilege was not implicated. Therefore, they are not entitled to depose Messrs. Bell and Strodthoff again.

III.

Defendants also complain that the Trustee's privilege log does not adequately disclose the factual basis for the assertion of the attorney-client privilege or the work-product privilege. The defendants argue that, as a matter of law, many of these documents cannot be protected by the attorney-client privilege or the work-product privilege, because the authors of the documents are not attorneys and the log does not reveal that these documents were sent to, or copied to, attorneys. The Trustee did not respond in writing to these contentions, undoubtedly because the defendants made these arguments in their reply brief.

The work-product privilege can apply to documents prepared by non-attorneys, if those documents were prepared in anticipation of litigation. [FN13] Furthermore, communications originating from non-attorneys can be protected by the attorney-client privilege, if those communications relay legal advice from counsel to a party with a common interest. [FN14]

> FN13. *See, e.g., Mullins v. Vakili,* **506 A.2d 192, 196 (Del.Super.Ct.1986)** "[ T]he qualified work product immunity ... extends not only to non-attorneys, but also to material prepared before litigation commences."

> FN14. *See* Del. R. Evid. 502(b); *see also*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 5

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

**(Cite as: 2005 WL 2037353 (Del.Ch.))**

*Am. Legacy Found. v. Lorillard Tobacco Co.*, 2004 Del. Ch. LEXIS 157, at *10 n. 14 (Del. Ch. Nov. 3, 2004) (stating that the attorney-client privilege protects communications "by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest.").

However, after reviewing the Trustee's privilege log, the court finds that, while the basis for asserting the work-product privilege to many of these documents is obvious from the log, the basis for asserting the attorney-client privilege is not. The court concludes that the proper procedure is to allow the Trustee to amend its log to state more clearly the basis for its claim of the attorney-client privilege with respect to the challenged documents. After such an amendment, the court will be in a better position to judge whether the Trustee's assertion that these documents are privileged is tenable.

CONCLUSION

For the above reasons, defendants' motion to compel is GRANTED in part and DENIED in part. IT IS SO ORDERED.

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 3971171 (Trial Motion, Memorandum and Affidavit) Post-Trial Answering Brief of Defendant George R. Hornig (Nov. 23, 2005)

• 2005 WL 3971173 (Trial Motion, Memorandum and Affidavit) Corrected Pretrial Brief of Defendants U.S. Timberlands Klamath Falls L.L.C., U.S. Timberlands Finance Corp., U.S. Timberlands Yakima, L.L.C., U.S. Timberlands Holdings Group, L.L.C., U.S. Timberlands Services Company, L.L.C., John M. Rudey and Georg e R. Hornig (Jul. 28, 2005)

• 2005 WL 3971172 (Trial Motion, Memorandum

and Affidavit) Pre-Trial Brief of Defendants Alan B. Abramson, Aubrey L. Cole. Robert F. Wright and William A. Wyman (Jul. 27, 2005)

• 2005 WL 2787405 (Trial Motion, Memorandum and Affidavit) Motion in Limine to Exclude Counterclaims, or in the Alternative. to Dismiss the Counterclaims (Jul. 19, 2005)

• 2005 WL 2787411 (Trial Motion, Memorandum and Affidavit) Motion in Limine to Exclude Counterclaims, or in the Alternative, to Dismiss the Counterclaims (Jul. 19, 2005)

• 2005 WL 3971174 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Motion to Dismiss (Jul. 1, 2005)

• 2005 WL 1801665 (Trial Pleading) Answer and Counterclaim (Jun. 16, 2005)

• 2005 WL 1502018 (Trial Motion, Memorandum and Affidavit) Answering Brief of Plaintiff U.S. Bank National Association, in its Capacity as Indenture Trustee, to Defendants' Motion to Dismiss the Third Amended Complaint (Jun. 2, 2005)

• 2005 WL 1502016 (Trial Motion, Memorandum and Affidavit) Defendants' Answering Brief in Opposition to Motion to Dismiss (May 26, 2005)

• 2005 WL 1502017 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of U.S. Bank National Association's Motion to Dismiss Defendants' Counterclaims (May 13, 2005)

• 2005 WL 1339874 (Trial Motion, Memorandum and Affidavit) Motion To Dismiss Defendants's Counterclaims (May 5, 2005)

• 2005 WL 1223220 (Trial Pleading) Answer to Third Amended Complaint for Declaratory and Injunctive Relief (Apr. 25, 2005)

• 2005 WL 1339872 (Trial Pleading) Answer to third Amended Complaint For Declaratory and Injunctive Relief (Apr. 25, 2005)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 2005 WL 2037353 (Del.Ch.)

**(Cite as: 2005 WL 2037353 (Del.Ch.))**

• 2005 WL 1339868 (Trial Motion, Memorandum and Affidavit) Defendants' Motion To Dismiss Plaintiff's Counts I, V-IX Of The Third Amended Complaint For Declaratory And Injunctive Relief (Apr. 22, 2005)

• 2005 WL 1223401 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Plaintiff U.S. Bank National Association, in its Capacity as Indenture Trustee, to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File Amended Complaint (Mar. 23, 2005)

• 2005 WL 756289 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Leave to File Amended Complaint (Mar. 16, 2005)

• 2005 WL 851487 (Trial Motion, Memorandum and Affidavit) Response in Opposition to Motion for Certification of Interlocutory Appeal (Jan. 25, 2005)

• 2004 WL 3267448 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Their Motion to Dismiss the Second Amended Complaint (Nov. 12, 2004)

• 2004 WL 2683993 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of Their Motion to Dismiss the Second Amended Complaint (Oct. 15, 2004)

• 2003 WL 24210898 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Plaintiff U.S. Bank National Association's Motion for Preliminary Injunction (Dec. 24, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*31657622**    Only the Westlaw citation is currently available.

UNPLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

**Noel SAITO, Plaintiff,**
v.
**MCKESSON HBOC, INC., a Delaware corporation, Defendant.**

No. Civ.A. 18553.
Submitted Oct. 22, 2002.

Decided Oct. 25, 2002.

Revised Nov. 13, 2002.

Pamela S. Tikellis and Robert J. Kriner, Jr., of Chimicles & Tikellis, Llp, Wilmington, Delaware; Robert S. Green and Robert A. Jigarjian, of Green & Jigarjian, LLP, San Francisco, California, for Plaintiff, of counsel.

Anthony W. Clark, Paul J. Lockwood, Michael A. Barlow and Cynthia E. Carrasco, of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Jonathan J. Lerner, of Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, and James E. Lyons and Timothy A. Miller, of Skadden, Arps, Slate, Meagher & Flom LLP, San Francisco, California, for Defendant, of counsel.

Richard M. Humes and Melinda Hardy, Office of the General Counsel, Securities and Exchange Commission, Washington, D.C., for the SEC as Amicus Curaie.

*OPINION*

CHANDLER, J.

**\*\*1** Plaintiff Noel Saito instituted this action under 8 *Del. C.* § 220 to obtain access to certain books and records of defendant McKesson Corporation ("McKesson"). This is the Court's decision, after a trial and following briefing, with respect to certain records of McKesson as to which it has asserted attorney-client privilege and the work product doctrine. (FN1)

Plaintiff's action seeks the books and records of McKesson Corporation (formerly McKesson HBOC,

Inc.), a Delaware corporation. McKesson HBOC was formed through the merger of McKesson Corporation and HBOC & Co. ("HBOC") on January 12, 1999. Approximately 3 1/2 months after McKesson's acquisition of HBOC became effective, McKesson HBOC announced the first of what appears to be three downward revisions of revenues, earnings, net income, and other financial information, for financial years 1996-1998.

After these announcements, the Securities and Exchange Commission's (SEC) Office of Enforcement began an informal inquiry into whether McKesson HBOC had filed materially false or misleading financial statements. (FN2) The next day (April 29, 1999) the SEC notified McKesson that it had begun an informal inquiry into whether McKesson HBOC had filed materially false or misleading financial statements. McKesson HBOC's audit committee then retained Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") on May 3, 1999. Skadden, in conjunction with PricewaterhouseCoopers LLP ("PwC"), conducted an internal investigation of the alleged wrongdoing and prepared a written report for the audit committee, summarizing the relevant facts and legal principles involved in the various pending actions and investigations.

Skadden informed the SEC and the United States Attorney's Office for the Northern District of California ("USAO") of this investigation and offered to disclose the work product generated from this internal investigation upon the condition that the materials would be subject to a confidentiality agreement. Most of this work product was shared after a confidentiality agreement was executed among McKesson, the SEC, and the USAO on May 27 and 28, 1999. Five documents, however, were disclosed to the SEC prior to the execution of the confidentiality agreement. These documents are numbers 7 and 9-12 on the First Privilege Log.

Plaintiff, along with other shareholders, filed a derivative suit in this Court based on the earnings restatements and alleged wrongdoing. (FN3) Defendant moved to dismiss the derivative action, which I granted without prejudice. I also allowed plaintiff leave to amend the complaint after gathering the facts necessary to file a legally sufficient complaint. (FN4)

Plaintiff filed this § 220 action on December 14, 2000. At a pre-trial conference, the parties agreed to bifurcate the issues, addressing the scope of the

© 2006 Thomson/West. No claim to original U.S. Govt. works.

inspection first, and later addressing the issues relating to attorney-client privilege and the work product doctrine. The issues concerning the scope of the inspection have been addressed in a separate opinion, and numerous documents and records have been ordered produced to plaintiff. (FN5) This opinion determines the applicability of the attorney-client privilege and work product doctrine to certain documents that continue to be in dispute.

**\*\*2** The disputed information plaintiff seeks is listed on four separate privilege logs. Defendant asserts that plaintiff is not entitled to these particular documents because of the attorney-client privilege, the work product doctrine, or both. (FN6) The documents are best identified by separating them into four different groups. Group A consists of documents McKesson HBOC produced to the SEC and the USAO. (FN7) Group B consists of premerger legal advice to defendant. (FN8) Group C consists of post-merger legal advice and board minutes. (FN9) Group D is a catch-all of all documents prepared by in-house counsel but not produced to the SEC or the USAO. (FN10) For reasons set forth below, I grant the motion to compel in part, and deny it in part.

## I. ANALYSIS

### A. Documents Shared with the SEC and/or the USAO

Group A documents are those disclosed by McKesson HBOC to the SEC. Most of these documents were not disclosed until a confidentiality agreement was signed with the SEC. Group A documents include Items 7, 9-21, 23-114 of the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. The documents shown to the SEC before the confidentiality agreement was in place are documents 7 and 9-12 of the First Privilege Log. Defendant asserts a work product privilege as to all of these documents and attorney-client privilege as to four of them. Plaintiff Saito contends that these documents are not shielded by the work product doctrine or attorney-client privilege.

#### 1. Work Product Doctrine

Saito contends that the work product doctrine is inapplicable to the Group A documents because the documents were not confidential and because any privilege that would have attached was waived when the documents were disclosed to potential adversaries -the SEC and/or USAO.

The documents in dispute were prepared in anticipation of litigation and were intended to be confidential. Thus, the documents clearly qualify as work product. Plaintiff argues that the McKesson HBOC board did not specifically empower the audit committee with defending securities litigation, so the resulting investigative reports by the audit committee were not prepared in anticipation of litigation. The audit committee retained the law firm of Skadden and the accounting firm PwC, however, for that specific purpose. Skadden shared a dual role-the firm was assisting McKesson HBOC in its internal review, as well as defending various lawsuits linked to the subject of this very same investigation.

Plaintiff also argues that McKesson HBOC never intended the reports to be confidential. McKesson HBOC, however, clearly negotiated a confidentiality agreement with the SEC before disclosing the documents at issue. Therefore, the documents do not lose their work product protection simply because the board failed explicitly to state that the report may also be used to assist in any anticipated litigation and that the materials prepared during the audit committee investigation were intended to be confidential.

**\*\*3** The pivotal question remaining is whether McKesson HBOC waived its work product privilege as to these documents by sharing them with the SEC in its investigation. The traditional work product doctrine has been codified in Chancery Court Rule 26(b)(3), and generally bars the discovery of materials created in anticipation of litigation or for trial preparation. (FN11) But this bar is not an "impenetrable barrier." (FN12) It is a qualified immunity. (FN13) It allows a party to seek materials prepared in anticipation of litigation only when the party: 1) has a substantial need for the materials; and 2) the party cannot acquire a substantial equivalent of the materials by other means without undue hardship. (FN14) Even when such a showing of need and unavailability is made, the rule specifically protects the mental impressions, conclusions, opinions and legal theories of the party's attorney. (FN15) This is referred to as *opinion* work product (as opposed to trial preparations that are merely historical or fact based). Opinion work product is subject to disclosure according to a more stringent standard. A court will protect opinion work product unless the requesting party can show that it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling*. (FN16)

All of the Group A documents are designated as

© 2006 Thomson/West. No claim to original U.S. Govt. works.

work product. The issue is whether McKesson HBOC waived its claim to work product privilege over Group A documents when it disclosed those documents to the SEC.

### a. Waiver of the Work Product Privilege

As with any privilege, the protection of work product may be waived when it no longer serves its useful purpose. The purpose behind the protection of work product is "to promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent." (FN17) The adversary system is promoted because this protection allows clients to seek informed legal guidance and allows attorneys to prepare their cases without fear that these preparations will be used against their clients. (FN18) Thus, the focus of the doctrine is upon preventing discovery of the work product from an *opposing party in litigation,* not necessarily from the rest of the world generally." (FN19) Courts and legislatures have consistently found that these benefits are so important that they outweigh society's competing interest in revealing all material facts relevant to the resolution of a dispute. (FN20)

Such waivers are rarely granted in Delaware because of their harsh result. (FN21) Indeed, a finding of waiver of opinion work product protection should only be made in cases of the most egregious conduct by the holder of the privilege. (FN22) In order to waive a privilege, an individual must know of a particular right and voluntarily and intentionally choose to relinquish it. (FN23) A waiver does not always have to be express, it may also be implied from the circumstances. (FN24)

**\*\*4** Disclosure of work product does not negate its protection unless the disclosure is "inconsistent with the maintenance of secrecy from the disclosing party's adversary." (FN25) A party may relinquish its right to protection of its work product if it knowingly and voluntarily discloses it with "either the intention or practical result that the opposing party may see the documents." (FN26)

There is no waiver of privileged information to third parties if a disclosing party had a reasonable expectancy of privacy when it made an earlier disclosure. In assessing whether a party had a reasonable expectation of privacy in the disclosure, the Court generally asks two questions: 1) did the disclosing party believe its disclosure was confidential; and 2) will the law sanction that

expectation? (FN27) Two contexts where this consideration arises are in the common interest exception and in making disclosures pursuant to a confidentiality agreement.

### 1. Common Interest Exception

Disclosures to a third party do not waive attorney work product when the disclosing party and its recipient share some common interest. Under this "common interest" exception, a communication may still be classified as confidential even after its disclosure to others, as long as those others have interests that are "so parallel and non-adverse that, at least with respect to the transaction involved, they may be regarded as acting as joint venturers." (FN28) The traditional example of this is the co-defendant situation. This "common interest exception" or "joint prosecution privilege" (FN29) will attach when the persons sharing the information have a common adversary or share a common interest in the litigation. When persons sharing a common interest share work product, the parties reasonably expect the disclosures to be confidential. Courts sanction such disclosures because they further the adversarial system by allowing the attorneys to collectively gather fruits in preparation for litigation without the risk of those fruits being plucked by the common adversary.

McKesson-HBOC argues that it shared a common interest with the SEC when it disclosed the privileged documents at issue, and, therefore, the work product protection was not waived. Saito disagrees, insisting that McKesson HBOC was not aligned with the SEC and was, in fact, a target of an SEC investigation when the disclosure was made. Thus, Saito contends, the two entities did not share a common interest and McKesson HBOC had no reasonable expectation of privacy in the documents provided to the SEC.

The common interest question here boils down to whether the SEC acts as a friend or foe when it begins investigating a company for potential violations of the Securities Act. I *think* the more reasonable conclusion is that the SEC was a foe in this instance. (FN30)

The adversarial relationship here is strikingly similar to that in *In re Steinhardt Partners, L.P.* (FN31) The *Steinhardt* Court noted that

**\*\*5** the SEC stood in an adversarial position to Steinhardt when it requested assistance. This was

© 2006 Thomson/West. No claim to original U.S. Govt. works.

not a case in which a party complied with a benign request to assist the SEC in performing its routine regulatory duties. The determinative fact in analyzing the adversarial nature of the relationship is that Steinhardt knew that it was the subject of an SEC investigation, and that the memorandum was sought as part of this investigation. The fact that the request came from the SEC's Enforcement Division further supports the conclusion that this was an adversarial relationship. (FN32)

Similarly, McKesson was aware that the nature of its relationship with the SEC was adversarial before disclosing its work product. McKesson knew it was a target, knew the disclosure was being sought as part of this investigation, and knew the investigation was being conducted by the enforcement arms of two different agencies immediately following a public admission of wrongdoing. These enforcement agencies were *not* "friendly" to McKesson. In fact, as Saito points out, and defendant concedes, the SEC expressly disavowed sharing a common interest with McKesson. (FN33)

The fact that McKesson "cooperated voluntarily does not transform the relationship from adversarial to friendly." (FN34) McKesson had sufficient reason to comply with the SEC and USAO even if its interests were adverse. As other courts have noted, such enforcement agencies are formidable adversaries. (FN35) Even though they may be considered foes, a party under investigation has significant incentives to cooperate with the authorities. The disclosing party often decides that the benefits of cooperation outweigh the possible damage that may be caused by the information it discloses. Such benefits often include more lenient treatment, avoidance of extensive formal investigation and enforcement litigation, and an opportunity to narrow the issues. (FN36) By yielding to these formidable opponents in order to minimize future damages, a disclosing party does not make those opponents its friend. It merely concedes that it prefers not to anger such a foe.

McKesson HBOC argues that it had a common interest with the SEC and USAO in that it too wanted to weed out the wrongdoers in the company. But this is not the type of common interest the exception contemplates. Cooperation with a government investigation may be a "laudable activity," (FN37) but it does not align one's interests with that government entity. (FN38) As noted above, the interest between the disclosing party and the recipient must be "so parallel and non-adverse that, at least with respect to the transaction involved, they may be

regarded as acting as joint venturers." (FN39) McKesson HBOC was not a joint venturer with the SEC or USAO because it was under investigation and its interests were adverse to these enforcement entities when the work product was disclosed. Thus, they did not share a common interest.

2.  Disclosure Pursuant to a Confidentiality Agreement

**6 Another instance in which a disclosing party's expectations of privacy may be heightened is when that party secures a confidentiality agreement before agreeing to disclosure of privileged information. As noted in *Westinghouse Elec. Corp. v. Phillippines*, (FN40) there are

two distinct types of waivers: selective and partial. Selective waiver permits the client who has disclosed privileged communications to one party to continue asserting the privilege against other parties. Partial waiver permits a client who has disclosed a portion of privileged communications to continue asserting the privilege as to the remaining portions of the same communications. (FN41)

The Delaware Supreme Court has already determined that it is sometimes unfair to allow for *partial* waivers of work product. (FN42) No Delaware court, however, has decided whether to allow *selective* waivers of work product. Selective waiver is the type of waiver at issue in this case, as McKesson HBOC has selectively disclosed its work product to the SEC and now asserts its work product privilege as to these same documents when requested by plaintiff Saito.

Fairness concerns generally govern *partial* waivers, (FN43) but fairness has little relevance in the context of *selective* waivers. (FN44) This is because disclosure to one adversary does not prejudice a subsequent adversary any more than it would have if the initial disclosure had never been made. I agree with Chief Judge Becker of the United States Third Circuit Court of Appeals in that I "do not see how disclosing protected materials to one adversary disadvantages another." (FN45) Thus, fairness is not determinative and a plaintiff must provide some other reason why the privilege protecting the work product of its opponent should be waived when that work product was confidentially disclosed to a law enforcement agency in its investigation. Plaintiff Saito has failed to provide such a justification in this instance. Instead, public policy seems to mandate that courts continue to protect the confidentially

© 2006 Thomson/West. No claim to original U.S. Govt. works.

disclosed work product in order to encourage corporations to comply with law enforcement agencies.

I must first determine whether McKesson HBOC had a reasonable expectation of privacy in its work product documents when it disclosed those documents to the SEC pursuant to a confidentiality agreement in the course of an investigation. If so, I must then determine whether to sanction that expectation. First, I find that McKesson HBOC did have a reasonable expectation of privacy in its disclosure to the SEC of documents secured by a confidentiality agreement. (FN46) As already noted, the work product doctrine exists to protect the fruits of attorney preparations from being used against their clients. When attorneys secure a confidentiality agreement before sharing their work product with the SEC, as McKesson HBOC's attorneys did, those attorneys can reasonably assume that the SEC would not reveal those confidential disclosures to other adversaries.

**7 Although it can be argued that McKesson HBOC should not have had an expectation of privacy because some other courts have decided that such disclosures waive work product privilege, the courts of Delaware have not considered the issue. In fact, plaintiff, defendant, and the SEC alike fight this battle in this Court using weaponry borrowed almost exclusively from foreign jurisdictional battlefields because Delaware's terrain is barren. The vigorousness of this clashing of swords suggests that the matter is far from settled even on foreign soil.

The resulting decisions cover the entire spectrum-from protection of work product in the absence of a confidentiality agreement to no protection of work product even when a disclosure was secured by a confidentiality agreement. The Eighth Circuit first established the selective waiver doctrine and protected work product disclosures made to the SEC during a private, nonpublic investigation, even without a confidentiality agreement in place. (FN47) The D.C. Circuit has since found that work product privilege could only be preserved if a confidentiality agreement is in place before the disclosure. (FN48) The Second, Third, Fourth, and Sixth Circuits have found that waiver of the privilege as to one opponent waives the privilege as to all when there is no confidentiality agreement in place. (FN49) Of these, some indicated that a confidentiality agreement may have changed the outcome of their decision. (FN50) Only two cases cited to this Court found that the privilege was waived even when the disclosure was

subject to a confidentiality agreement. (FN51) Therefore, in light of conflicting but non-binding precedent, McKesson HBOC acted reasonably in expecting that its disclosures to the SEC under a confidentiality agreement would not reach the hands of its other adversaries.

Second, because McKesson HBOC reasonably believed that its disclosures would remain confidential, the remaining question is whether this Court should sanction an expectation of privacy when it arose from an attempt to cooperate with a law enforcement agency investigation. For the reasons discussed below, I believe the more prudent policy would be to recognize such expectations of privacy and hold that McKesson HBOC can therefore assert its work product privilege over Group A documents disclosed under a confidentiality agreement.

As noted earlier, Delaware courts vigorously protect work product and treat waiver as an extremely *harsh* result. Waivers are meant to punish those who do not protect the secrecy of their work product from adversaries during discovery but then wish to prevent that disclosed work product from being introduced as evidence at trial. Waivers are a penalty reserved for egregious abuses by the privilege holder. I fail to see how an attorney who confidentially discloses work product on behalf of her client pursuant to a law enforcement agency investigation can be accused of egregious abuse of this privilege.

**8 Of course, as other courts have noted, voluntary disclosure is often made to law enforcement agencies because there is already some benefit to be gained from such a disclosure. (FN52) For example, corporations may cooperate with SEC investigations to avoid extended formal investigation and enforcement litigation, to receive more lenient treatment, and to narrow the investigated issues. (FN53) Although there is something to be gained from cooperation, the fact remains that cooperation requires the company to often divulge highly sensitive and incriminating information. There is a balance in place already-whether the corporation should air its dirty laundry in exchange for mercy or whether to force the law enforcement agency to do its own legwork (and possibly overlook or fail to discover some of the incriminating evidence) at the cost of more stringent treatment.

When courts amplify the risk of disclosure to include future private plaintiffs, the scales begin to tip further in favor of corporate noncompliance with investigative agencies. A rigid rule leading to such

© 2006 Thomson/West. No claim to original U.S. Govt. works.

an unwholesome trend seems unwise. Instead, a practical rule that would reduce the risk of secondary unintended disclosure to private plaintiffs from this initial balance would likely benefit both law enforcement agencies and the future private plaintiffs they were established to protect.

A selective waiver rule is such a rule that benefits law enforcement agencies, such as the SEC. Encouraging corporations to disclose their internal investigations confidentially allows the SEC to resolve its investigations expeditiously and efficiently. The SEC restricts its grants of confidentiality agreements to situations where it has reason to believe that obtaining work product is in the public interest and will result in greater efficiency in the investigation. (FN54) When the SEC benefits from a substantial savings in time and resources, it resolves a higher volume of investigations. (FN55)

These benefits have an interesting spillover benefit for private plaintiffs as well. Because of the SEC's savings and efficiency, greater protection is afforded to the beneficiaries that it seeks to protect-investing shareholders such as plaintiff Saito. The SEC is the "agency principally responsible for the administration and enforcement of federal securities laws, which are designed to protect investors and the integrity of our capital markets." (FN56) When the SEC more efficiently protects the integrity of capital markets, shareholders benefit. In fact, plaintiff Saito, the shareholder contesting the confidentiality of this disclosure, has already benefited by McKesson HBOC's disclosure. Thus, the SEC and private litigants alike benefit from confidential disclosures because the integrity of the capital markets is preserved at a lower cost to society.

Undoubtedly it would provide private plaintiffs a strong tactical advantage to have open access to the trial preparations of their opponents. Plaintiff, however, has offered no justification for receiving such open access into the legal strategies and opinion work product of its opponent. Such an assertion is no different from the "have my cake and eat it too" mentality with which some jurisdictions charge disclosing parties. For example, in the context of selective waiver of the attorney-client privilege, the D.C. Circuit stated that

**\*\*9** [t]he client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others, or to invoke the privilege as to communications whose confidentiality

he has already compromised for his own benefit.... The attorney-client privilege was not designed for such tactical employment. (FN57)

Although the attorney-client privilege is waived more easily than the work product privilege, a few jurisdictions have extended this policy to further justify a full waiver of the work product privilege. (FN58) Some courts admonish disclosing parties for desiring to maintain secrecy over their work product because they already benefited from the disclosure by receiving potential lenient treatment from law enforcement agencies. Thus, the courts reason, the disclosing party should not later complain that this benefit resulted in the unpleasant consequence of stripping the privilege protection of those documents as against any and all future adversaries. They reason that litigants cannot pick and choose adversaries because they cannot have their cake and eat it too.

And yet, this reasoning fails to note two things: 1) disclosing parties actually are not having their cake and eating it too; and 2) the private litigating parties are just as guilty of wanting to have their cake and eat it too. First, disclosing parties can hardly be characterized as having their cake and eating it too. Disclosures made to the SEC when the corporation is under investigation are not really akin to enjoying a dessert. A disclosure to the SEC does not absolve the corporation of liability for the acts disclosed. The corporation may hope to obtain leniency by disclosing, but it comes with a cost-airing the corporation's dirty laundry.

Second, litigating shareholders want to have their cake and eat it too: they want disclosing parties to continue disclosing to the SEC so they are better protected, while at the same time they want access to these disclosures for their own tactical advantage. Yet, these two desires are in tension with one another because to encourage the first, the second is necessarily discouraged. Imposing the harsh consequence of a waiver upon disclosing parties would discourage confidential disclosures. When the benefits of leniency from the SEC are uncertain, yet the burden of exposing a company's Achilles heel to a flood of adversaries is certain, corporations will be less likely to choose to disclose work product to the SEC. It seems inconsistent to deny a selective waiver rule and expect continued cooperation with law enforcement agencies when a confidential disclosure is such a double-edged sword for the corporation.

Private lawsuits are an important part of the

© 2006 Thomson/West. No claim to original U.S. Govt. works.

enforcement scheme, but the SEC is the governmental institution established as the first line of defense. I see no reason why we should not tip the scales in its favor when it will advantage all parties involved in some way, and will disadvantage none of them. Private lawsuits are not deterred by encouraging cooperation with the SEC, as private plaintiffs may still bring suit and have the same ability to acquire such work product if their need is great enough.

**\*\*1** Plaintiff Saito has asserted no other policy reason why I should reject a selective waiver rule in favor of allowing it to access the trial preparations of its adversary. A fundamental advantage of our adversary system is that attorneys are able to prepare their own cases without fear of such preparations being used against their clients. Although both parties to a dispute generally work with the same non-privileged underlying information, their attorneys digest, analyze and organize the material in different ways, resulting in their unique work product. This work product often includes their mental impressions, conclusions, opinions and legal theories.

Work product is protected because courts have determined that the adversarial system is better served when parties have access to only each other's factual information in discovery, not to their thought processes. As noted by Justice Jackson, "discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." (FN59) I know of no good reason why an opponent should borrow the wits of its adversary simply because that adversary was cooperating with a law enforcement agency. This outcome prevents both the SEC and the private plaintiffs from benefiting from confidential disclosures of work product rather than encouraging the benefits inherent in a selective waiver approach. It simply increases the cost of compliance with law enforcement agencies. (FN60) As noted by the Eighth Circuit it may also "have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers." (FN61)

This is a simple rule to navigate as well. There is no line-drawing problem because law enforcement agencies are readily distinguishable from private plaintiffs. Although there may be problems inherent in treating different*private* plaintiffs differently, there is no reason why a court should not treat a law

enforcement agency differently than private plaintiffs. Law enforcement agencies are different types of adversaries. When corporations become less adversarial with law enforcement agencies, this cooperation is in the investing public's best interest.

The only other substantial argument made in opposition to the selective waiver rule is that it does not further the purpose of the attorney work product privilege-to promote the adversary system. This purpose may not be furthered, but it is also not hindered. Because a confidentiality agreement would prevent the law enforcement agency from passing along privileged information to other private adversaries, the adversarial system is still protected. Thus, this last justification for rejecting a selective waiver rule when a confidentiality agreement is in place seems inadequate to override the strong public interest such a rule would serve. As noted above, such a rule does not disadvantage private plaintiffs-they are in the exact same position they would have been if no disclosure had been made. Further, private plaintiffs still have the same ability to discover the work product of their opponent if they can show that their need is great enough.

**\*\*1** Thus, because I find that it is in the best interests of the shareholders to encourage corporate compliance, and because the law enforcement agencies are designed by our legislature as the first line of defense for such shareholders, I adopt a selective waiver rule for disclosures made to law enforcement agencies pursuant to a confidentiality agreement. Confidential disclosure of work product during law enforcement agency investigations relinquishes the work product privilege only as to that agency, not as to the client's other adversaries. The selective waiver rule encourages cooperation with law enforcement agencies without any negative cost to society or to private plaintiffs.

Accordingly, I conclude that McKesson HBOC had a reasonable expectation of privacy in its disclosure of work product to the SEC under the protection of a confidentiality agreement. This expectation is one that this Court will sanction. Therefore, McKesson HBOC did not waive its ability to assert the work product privilege as to most of the documents within Group A. Five documents (7 and 9-12 on the First Privilege Log) were shown to the SEC before the confidentiality agreement and were not protected by it. Thus, defendants had no expectation of privacy as to these documents and have waived their work product privilege. These documents must be given to plaintiff Saito. The other documents within Group A

will maintain their work product protection. The only remaining question, then, is whether plaintiff Saito has shown a substantial need for the remaining Group A documents.

### b. Overcoming Work Product Privilege

As noted above, there are two types of work product: non-opinion (factual/historical) work product and opinion work product. Each type of work product has its own standard of protection under Delaware law. A party may receive non-opinion work product when the party has a *substantial need* for the materials and the party cannot acquire a substantial equivalent of the materials by other means without *undue hardship.* (FN62) A party may receive opinion work product when it is *directed to the pivotal issue* in the current litigation and the need for the information is *compelling.* (FN63)

### 1. Non-Opinion Work Product

Under Chancery Court Rule 26(b)(3), a party may discover non-opinion work product if it shows it has a *substantial need* for the materials and it cannot acquire a substantial equivalent without *undue hardship.* The documents appearing to contain historical or fact information but no mental impressions, theories, or opinions are items 9-16, 23-25, 30-65, 67-73, 76-79, 81-101, 106-114 on the First Privilege Log and the letter dated 11/19/99 on Fourth Privilege Log.

Plaintiff has failed to meet the substantial need/undue hardship test in this instance. In his opening brief, plaintiff applies the *Garner* factors to the work product, even though this Court has held that there is no *Garner* exception to the work product privilege. (FN64) Of the twenty pages in this brief, only one paragraph is even dedicated to establishing Saito's need/hardship. Plaintiff limits his "proof" that he has a substantial need for the challenged documents to a conclusory statement that they are "necessary to his determination of Defendant's actions regarding the acquisition of HBOC and what fiduciary duties were breached in that transaction." (FN65) Undue hardship is based upon plaintiff's assertion that the "documents are available from no source other than Defendant." (FN66)

**\*\*1** Further, in his reply brief, plaintiff is similarly inattentive to the substantial need/undue hardship test. For Group A documents, Saito relies solely on the argument that work product protection was waived.

Even giving Saito the benefit of an inferential leap by treating the documents as Group C documents, (FN67) Saito still fails to establish his substantial need/undue hardship. In his twenty-five page reply brief, plaintiff limits his substantial need argument to a statement that the documents "involve discussion of the core matters Plaintiff is investigating." (FN68) Plaintiff provides no analysis of whether the challenged Group A documents fit the profile of such discussions, or even whether the documents in question were created before the challenged merger took place. Also, his undue hardship argument is limited to stating that "[t]here is no other way for Plaintiff to obtain the information contained in those [documents]." (FN69) Because plaintiff has failed to adequately assert his substantial need for these documents, Saito's motion to compel production of these documents is denied.

### 2. Opinion Work Product

Opinion work product includes the "mental impressions, conclusions, opinions and legal theories of a party's attorney" and is only discoverable when the requesting party shows it is directed to the pivotal issue in the current litigation and the need for the information is compelling. (FN70) The documents appearing to contain mental impressions and opinion work product are items 7, 17-21, 26-29, 66, 74-75, 80, 102-105 on the First Privilege Log.

Just as Saito has failed to establish his substantial need/undue hardship for non-opinion work product, he has similarly failed to meet the higher burden required to receive opinion work product. Thus, the motion to compel these documents is denied.

### c. Attorney-Client Privilege

The attorney-client privilege is based upon Rule 502(b) of the Delaware Rules of Evidence. This privilege protects communications made for the purpose of facilitating the rendition of professional legal services. (FN71) The privilege belongs to the client, and may be waived expressly or implicitly. (FN72) Waiver of one privilege does not necessarily waive another privilege, however, because the purposes behind each privilege are different. (FN73) I do not need to address attorney-client privilege in relation to most of the documents in Group A because they are protected by the work product doctrine and are subject to the analysis above, with the exception of document number seven on the First Privilege Log.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

Because document number seven was disclosed to the SEC prior to the issuance of a confidentiality agreement, McKesson HBOC manifested its intent for the document not to remain confidential. Thus, it waived its attorney-client privilege as to this document.

### B. Pre-Merger Legal Advice

Seven documents are sought under Group B. Defendant asserts attorney-client privilege on behalf of all seven. The second document on the third privilege log also contains a defense of work product and non-responsiveness to the claim. The privilege log description states that the document contains legal advice concerning the Amerisource litigation. This is a rather cryptic description, and it is unclear why plaintiff desires this information. Before I rule on this document, I ask defendant to produce the document(s) to me for an *in camera* inspection. The other documents will be addressed now.

**\*\*1** I grant the motion to compel production as to the documents relating to pre-merger legal advice as listed on the third privilege log, with the exception just stated concerning the Amerisource document. I base my decision on application of the well-known *Garner* (FN74) factors.

In *Deutsch v. Cogan*, (FN75) this Court held that "if the corporation objects to discovery and successfully establishes that the material sought is a confidential communication as to legal services between it and its attorney, then discovery is not authorized, unless the plaintiff stockholder seeking discovery shows 'good cause' why the privilege should not attach." (FN76) *Garner v.. Wolfinbarger* (FN77) provides "a non-exclusive list of factors for a Court to consider in deciding if 'good cause' exists." (FN78) The *Garner* factors relevant in a books and records action are:

"(i) the number of shares owned by the shareholder and the percentage of stock they represent;

(ii) the assertion of a colorable claim;

(iii) the necessity of the information and its unavailability from other sources;

(iv) whether the stockholder has identified the information sought and is not merely fishing for information; and

(v) whether the communication is advice concerning the litigation itself." (FN79)

Of these five factors, I place the least weight on (i). Granted, plaintiff owns minimal stockholdings, but that factor is not dispositive in determining whether good cause has been shown. Only if no other factor supports good cause will the ownership factor come into play. Therefore, I turn to factors (ii)-(v).

Plaintiff clearly asserts a colorable claim. As stated in this Court's earlier opinion:

> The examination and inspection of the books and records demanded herein is requested for the purpose of enabling Mr. Saito, through his duly empowered attorneys: (1) to further investigate breaches of fiduciary duties by the boards of directors of HBO & Co., Inc., McKesson, Inc., and/ or McKesson HBOC, Inc. related to their oversight of their respective company's accounting procedures and financial reporting; (2) to investigate potential claims against advisors engaged by McKesson, Inc. and HBO & Co., Inc. to the acquisition of HBO & Co., Inc. by McKesson, Inc.; and (3) to gather information relating to the above in order to supplement the complaint in *Ash v. McCall, et al.*, *2000 Del. Ch. LEXIS 144*, C.A. No. 17132 in accordance with the September 15, 2000, Opinion of the Court of Chancery of Delaware. (FN80)

To summarize, plaintiff's purpose is to recoup any investment loss that may have been the result of breaches of fiduciary duty. Plaintiff seeks books and records to determine if there was wrongdoing involved with the merger, which is a colorable claim.

The pre-merger legal advice is necessary to plaintiff's claim, and cannot be obtained elsewhere. Defendants assert that only financial advice is necessary for plaintiff to achieve his stated purpose. Plaintiff's purpose, however, is to determine what the board knew when approving the merger. The legal advice given to the board in conjunction with the merger is relevant and necessary in determining what information the board relied upon. This information, considered by the board before the merger, is not obtainable elsewhere. Therefore, plaintiff satisfies the third factor.

**\*\*1** The fourth factor is also met. Plaintiff seeks the legal advice given to the board prior to or in connection with the merger. This information is specific and relevant to plaintiff's stated purpose of determining whether wrongdoing occurred in connection with the merger.

© 2006 Thomson/West. No claim to original U.S. Govt. works.

The advice is also not addressed to the litigation itself, because the litigation had not commenced and the merger was not yet complete when the disputed advice was given. The purpose behind the advice was to aid the decision making of the board with respect to the merger. The fifth factor thus is met.

Plaintiff has shown a colorable claim, that the information is necessary and otherwise unobtainable, and that it specifically listed the desired information. The advice does not concern the pending litigation. Because plaintiff has shown good cause, I grant his motion to compel production of the pre-merger legal advice.

### C. Post-Merger Legal Advice

Twenty-three documents relating to post-merger legal advice are sought here in Group C. Defendant asserts attorney-client privilege and work product protection on all documents. For the reasons that follow, I deny the motion to compel with respect to these documents.

To rebut the privilege, plaintiff must show good cause, as delineated above. In this instance, plaintiff fails to satisfy factors (iii) and (v), and that is enough to deny a finding of good cause. Plaintiff has obtained the necessary underlying information through documents previously provided to him by defendant during discovery. Plaintiff does not have a right to defendant's legal analysis of that same information.

Defendant's legal analysis is also related to the litigation at hand. The improprieties at issue were discovered post-merger. At that point, defendant obtained legal advice to prepare for the ensuing litigation. To grant plaintiff access to this information, in my opinion, would be improper.

Plaintiff is also denied the post-merger legal advice under the work product doctrine. Work product is information assembled by an attorney in anticipation of litigation. (FN81) Work product provides a broader protection than attorney-client privilege since it includes more than just communications with the client. (FN82) To obtain work product, plaintiff must show a substantial need for the information and the inability to obtain it without undue hardship. (FN83)

The documents in question are work product (FN84) because they were prepared by attorneys in anticipation of litigation. As discussed above,

plaintiff already possesses the necessary information through other discovery provided by defendant. Because plaintiff has not shown a substantial need and undue hardship, I deny the motion to compel production of the twenty-three post-merger legal advice documents in Group C.

### D. Post-Merger In-House Counsel Documents

Plaintiff seeks six documents generated by in-house counsel. These six documents concern press relations, preservation of documents, and requests for information. Defendant asserts attorney-client privilege and work product protection. It also denies that the documents have any relevance to plaintiff's claims. Plaintiff makes the same arguments regarding these six documents as he does regarding the post-merger legal advice documents under Group C.

**\*\*1** Plaintiff's arguments with respect to privilege and work product fail for the same reasons stated above. Even if plaintiff showed good cause, substantial need, and undue hardship, however, the documents do not appear related to plaintiff's claims or purposes. In-house counsel created these documents to handle the non-substantive yet important issues related to McKesson being in litigation: dealing with the press, requests for information, and preservation of documents. None of these documents relate to plaintiff's purpose in determining if board members violated their fiduciary duties when they recommended and approved the merger. Plaintiff's motion to compel production of the in-house counsel documents is denied.

## II. CONCLUSION

For all the reasons stated above, I grant the motion to compel with respect to the documents disclosed to the SEC prior to the confidentiality agreement: documents 7 and 9-12 on the First Privilege Log. I also grant the motion to compel with respect to the pre-merger legal advice documents in Group B: documents 1, 3-7 on the Third Privilege Log. I request defendant to deliver document 2 on the Third Privilege Log to my chambers for an *in camera* inspection.

I deny the motion to compel as to the remaining Group A documents: documents 13-21, 23-114 on the First Privilege Log and the letter dated 11/19/99 on the Fourth Privilege Log. I also deny the motion to compel as to the post-merger legal advice in Group C: documents 1 and 22 on the First Privilege Log, all

© 2006 Thomson/West. No claim to original U.S. Govt. works.

documents on the Second Privilege Log, and the agenda dated 1/27/99 on the Fourth Privilege Log. Finally, the motion to compel is denied as to the post-merger in-house counsel documents in Group D: documents 2-6 and 8 on the First Privilege Log, documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

IT IS SO ORDERED.

(FN1.) Following remand from the Supreme Court, this Court addressed the scope of plaintiff's demand in an Order dated September 20, 2002. I have stayed that Order until the filing of this opinion. Language in the Order addressing the attorney-client privilege and the work product doctrine refers specifically to the results of this decision.

(FN2.) Pl.App. of Docs. in Support of Mot. to Compel Ex. A, 14.

(FN3.) *Ash v. McCall,* 2000 Del. Ch. LEXIS 144 at *1 (Del. Ch. Sept. 15, 2000).

(FN4.) *Id.*

(FN5.) *Saito v. McKesson HBOC, Inc.,* 2001 Del. Ch. LEXIS 96 at *4 (Del. Ch. July 10, 2001); 806 A.2d 113 (Del.2002); Order dated Sept. 20, 2002 (identifying records to be produced).

(FN6.) Each line of the privilege log states which defense is being made.

(FN7.) Items 7, 9-21, 23-114 on the First Privilege Log, letter dated 11/19/99 on Fourth Privilege Log. Item 22 on the First Privilege Log was listed as a Group A document by plaintiff, but, since it was not produced to the SEC or the USAO, I address this document under Group C.

(FN8.) All items on the Third Privilege Log.

(FN9.) Items 1 and 22 on the First Privilege Log; all items on the Second Privilege Log; agenda dated 1/27/99 on Fourth Privilege Log.

(FN10.) Items 2-6 and item 8 on the First Privilege Log; documents dated 5/14/99 and 5/20/99 on the Fourth Privilege Log.

(FN11.) In pertinent part, Rule 26(b)(3) provides that:

[A] party may obtain discovery of documents and

tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

(FN12.) *Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254, 262 (Del.1995).

(FN13.) *Id.*

(FN14.) DEL. CT. CH. R. 26(b)(3).

(FN15.) *Id.* While the rule states that the Court "shall protect" against disclosure of attorney opinion work product, the Delaware Supreme Court has subsequently interpreted the rule to hold that opinion work product *is* discoverable upon an even stronger showing of substantial need and unavailability. *Tackett,* 653 A.2d at 262. This "more substantial need" is met when a party shows that the mental impressions are: 1) directed to the pivotal issue in the current litigation; and 2) the need for the information is compelling. *Id.*

**1 (FN16.) *Tackett,* 653 A.2d at 262.

(FN17.) *United States v. AT & T Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980).

(FN18.) *Westinghouse Elec. Corp. v. Philippines,* 951 F.2d 1414, 1428 (3d Cir.1992).

(FN19.) *United States v. AT & T Co.,* 642 F.2d at 1298-99 (emphasis added).

(FN20.) *See, e.g., Hickman v. Taylor,* 329 U.S. 495 (1947); *In re Subpoenas Duces Tecum,* 738 F.2d 1367 (D.C.Cir.1984).

(FN21.) *Wolhar v. GMC,* 712 A.2d 457, 463 (Del.Super.Ct.1997) ("[A] finding of waiver is discretionary with the court and rarely granted, as it is a harsh result."); *see also Tackett,* 653 A.2d at 260 (describing the "exacting" standard required to overcome work product protection, a standard that is "more stringent" than that required to overcome

© 2006 Thomson/West. No claim to original U.S. Govt. works.

attorney client privilege).

(FN22.) *Wolhar*, 712 A.2d at 463.

(FN23.) *Metro. Bank & Trust Co. v. Dovenmuehle Mortgage, Inc.*, 2001 WL 1671445 at *5 (Del. Ch. Dec. 20, 2001).

(FN24.) *United States v. AT & T Co.*, 642 F.2d at 1298-99.

(FN25.) *Id.* at 1299 (quoting *GAF Corp. v. Eastman Kodak Co.*, 85 F.R.D. 46, 51-52 (S.D.N.Y.1979).

(FN26.) *Wolhar*, 712 A.2d at 462-63.

(FN27.) *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 34210 at *2 (Del. Ch. March 20, 1986).

(FN28.) *Id.*

(FN29.) *WT Equip. Partners, L.P. v. Parrish*, 1999 WL 743498 at *1 (Del. Ch. Sept. 1, 1999) (withholding oral disclosures because they were made in accordance with the joint prosecution privilege, provided little relevance to solving the substantive issues and outweighed the potential prejudice caused by chilling future counsel preparations).

(FN30.) The question in such cases is "who is the target" of the SEC's investigation.    Is it the company?  Senior officers?  A rogue employee?  In this particular case, it is clear that the company, at the very least, was a target, and that is sufficient for purposes of my analysis.

(FN31.) 9 F.3d 230 (2d Cir.1993).

(FN32.) *Id.* at 234.

(FN33.) One court has found that the SEC could potentially share a common interest with a corporation in situations where the SEC is not adverse because individual wrongdoers, as opposed to the corporation itself, are the focus of investigation. *McKesson HBOC, Inc. v. Adler*, 562 S.E.2d 809 (Ga.Ct.App.2002). The Georgia Court of Appeals directed the trial court to examine whether the fact that the SEC investigation's focus was on former officers and employees, as opposed to current employees or the corporation itself, indicated that the SEC shared a common interest with the disclosing corporation.  This is not the situation here, however.  McKesson was itself a

target of the SEC investigation.  Thus, I need not discuss whether the SEC or another law enforcement agency could possibly share a common interest with a disclosing corporation.  Instead, McKesson is much more similar to *Cooper Hospital*, where law enforcement agencies were found to be adverse because the agencies were targeting the corporation, not just a few errant employees. *Cooper Hospital/University Medical Center v. Sullivan*, 183 F.R.D. 119 (D.N.J.1998).

(FN34.) *Cooper*, 183 F.R.D. at 119.

(FN35.) *In re Steinhardt Partners, L.P.*, 9 F.3d at 236; *In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1372 (D.C.Cir.1984); *In re Sealed Case*, 676 F.2d 793, 822-23 (D.C.Cir.1982).

**1 (FN36.) *In re Steinhardt Partners, L.P.*, 9 F.3d at 236.

(FN37.) *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C.Cir.1981).

(FN38.) *E.g., United States v. MIT*, 129 F.3d 681, 686 (1st Cir.1997) ("In a rather abstract sense, MIT and the audit agency do have a 'common interest' in the proper performance of MIT's defense contracts and the proper auditing and payment of MIT's bills.  But this is not the kind of common interest to which the cases refer in recognizing that allied lawyers and clients--who are working together in prosecuting or defending a lawsuit or in certain other legal transactions--can exchange information among themselves without loss of the privilege.  To extend the notion to MIT's relationship with the audit agency, which on another level is easily characterized as adversarial, would be to dissolve the boundary almost entirely.").

(FN39.) *Id.*

(FN40.) 951 F.2d 1414 (3d Cir.1992).

(FN41.) *Id.* at 1423 n. 7 (citations omitted).

(FN42.) *Tackett v. State Farm Fire & Casualty Co.*, 653 A.2d 254 (Del.1995).  A *partial* waiver may be implicit, even if unintentional, when fairness and consistency mandate that a partial disclosure of privileged information amounts to a full waiver of the privileged information if this disclosure places its opponent at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information.  *Id.* at 259-60 (finding that

© 2006 Thomson/West. No claim to original U.S. Govt. works.

insurance company asserting its routine handling of plaintiff's claim implicitly disclosed its reliance upon its counsel's communications and was, therefore, required to produce the privileged materials supporting this assertion).

(FN43.) Courts have noted that it may be unfair for a party to make an assertion revealing only portions of privileged information without allowing that party to examine the circumstances and evidence supporting that assertion. *See, e.g., Tackett v. State Farm Fire & Casualty Co.,* 653 A.2d 254 (Del.1995) (stating that "[i]mplicit waiver also requires that the partial disclosure place the party seeking discovery at a distinct disadvantage due to an inability to examine the full context of the partially disclosed information."); *Westinghouse Elec. Corp.,* 951 F.2d at 1426 n. 13 (finding that partial waiver may disadvantage adversary by allowing the disclosing party to present a one-sided story to the court).

(FN44.) *Westinghouse Elec. Corp.,* 951 F.2d at 1426 n. 14 (rejecting fairness rationale as basis for refusing selective disclosure because "when a client discloses privileged information to a government agency, the private litigant in subsequent proceedings is no worse off than it would have been had the disclosure to the agency not occurred.").

(FN45.) *Id.* at 1430.

(FN46.) For those documents not secured by a confidentiality agreement before disclosure, it follows that McKesson HBOC did not have any reasonable expectation of privacy.

(FN47.) *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 611 (8th Cir.1978).

(FN48.) *Permian Corp. v. United States,* 665 F.2d 1214, 1218 (D.C.Cir.1981) (upholding trial court's conclusion that a confidentiality agreement was in place before disclosures were made to the SEC and that this agreement prevented waiver of the work product privilege as to these documents).

(FN49.) *See, e.g., In re Steinhardt Partners,* 9 F.3d 230, 236 (2d Cir.1993); *Westinghouse Electric Corp. v. Philippines,* 951 F.2d 1414, 1431 (3d Cir.1992); *In re Martin Marietta Corp.,* 856 F.2d 619 (4th Cir.1988) (as to non-opinion work product); *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.,* 293 F.3d 289 (6th Cir.2002)

**\*\*1** (FN50.) *See In re Subpoenas Duces Tecum,* 738 F.2d 1367, 1375 (D.C.Cir.1984) (finding that to maintain confidentiality over work product, a corporation can simply refuse to disclose the work product or "the company can insist upon a promise of confidentiality before disclosure to the SEC."); *In re Steinhardt Partners, L.P.,* 9 F.3d 230, 236 (2d Cir.1993) (rejecting selective waiver in most situations but cautioning that "[e]stablishing a rigid rule would fail to anticipate situations ... in which the SEC and the disclosing party have entered into an explicit agreement that the SEC will maintain the confidentiality of the disclosed materials."); *Westinghouse Electric Corp. v. Philippines,* 951 F.2d 1414, 1431 (3d Cir.1992) (rejecting selective waiver doctrine as a general rule but finding that the result may differ when the SEC is not adversarial *and* disclosures were made pursuant to a confidentiality agreement).

(FN51.) *Westinghouse Electric Corp.,* 951 F.2d at 1431; *In re Columbia/HCA Healthcare Corp.,* 192 F.R.D. 575 (D.Tenn.2000).

(FN52.) *In re Steinhardt Partners, L.P.,* 9 F.3d at 235-36.

(FN53.) *Id.*

(FN54.) Br. of the United States SEC as *Amicus Curiae* at 2

(FN55.) For example, the SEC in its *amicus* brief asserts that it saved several hundred hours, used half the number of staff to investigate, and completed the investigation of McKesson much earlier than it would have done without the confidential disclosure in this case. The SEC has also benefited from confidentially disclosed reports from other targets that saved the SEC approximately 29,000 hours of work and another report saving approximately $9 million. Br. of the United States SEC as *Amicus Curiae* at 15-16.

(FN56.) Br. of the United States SEC as *Amicus Curiae* at 1.

(FN57.) *Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C.Cir.1981).

(FN58.) *E.g., Bowne v. Ambase Corp.,* 150 F.R.D. 465, 480 (S.D.N.Y.1993); *In re Subpoenas Duces Tecum,* 738 F.2d 1367 (D.C.Cir.1984); *In re Steinhardt Partners, L.P.,* 9 F.3d 230 (2d Cir.1993)

© 2006 Thomson/West. No claim to original U.S. Govt. works.

.

(FN59.) *Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring).

(FN60.) *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 311 (6th Cir.2002) (Boggs, J., dissenting op.) ("The court's rule does nothing more than increase the cost of cooperating with the government.").

(FN61.) *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir.1978).

(FN62.) DEL. CT. CH. R. 26(b)(3).

(FN63.) *Tackett*, 653 A.2d at 262. This Court has only found two instances where mental impressions have been granted to opposing parties. The limited situations include a claim of bad faith against an insurance company, *see id.,* and the circumstances surrounding the approval of a settlement agreement by the defendant when the result of the agreement would be the elimination of claims by the plaintiff. *See Fitzergald v. Cantor*, 1999 Del. Ch. LEXIS 10 at *11-*14 (Del. Ch. January 28, 1999). In light of this, it is obvious that Delaware law protects opinion work product in all but the most compelling circumstances where those mental impressions are crucial to the pivotal issue in the litigation and no other means of proving that issue exists.

(FN64.) *In re Fuqua Industries, Inc. S'holders Litig.*, 2002 Del. Ch. LEXIS 52 at *20 (Del. Ch. May 2, 2002).

(FN65.) Pl.'s Op. Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 15.

(FN66.) *Id.*

**1   (FN67.) Because the distinction of Group A documents (those disclosed to the SEC) disappears when the waiver argument fails, the documents should then be treated as no different from those in Group C (post-merger legal advice).

(FN68.) Pl.'s Reply Br. in Support of Mot. for Order to Compel Inspection of Demanded Docs. at 17.

(FN69.) *Id.*

(FN70.) *Tackett v. State Farm Fire & Casualty Co.*, 653 A.2d 254, 262 (Del.1995).

(FN71.) *Id. at* 259.

(FN72.) *Id.*

(FN73.) *Id.* at 260 (For example, "[w]aiver of the attorney-client privilege does not automatically relinquish the protection provided by the work product doctrine."); *Merisel, Inc. v. Turnberry Capital Mgmt., L.P.*, WL 252724 at *4 (Del. Ch. Apr. 20, 1999).

(FN74.) 430 F.2d 1093 (5th Cir.1970). I am, obviously, assuming (without deciding) that the pre-merger legal advice documents are protected by the attorney-client privilege. I hold only that Mr. Saito is entitled to access to the pre-merger documents because his status as a stockholder derivative plaintiff provides a mutual interest with McKesson. *See In re Fuqua Indus., Inc. S'holder Litig.*, 2002 WL 991666 at *4 (Del. Ch.).

(FN75.) 580 A.2d 100, 107 (Del.Ch.1990).

(FN76.) *Id.*

(FN77.) 430 F.2d 1093 (5th Cir.1970).

(FN78.) *Deutsch*, 580 A.2d at 107.

(FN79.) *Grimes v. DSC Communications Corp.*, 724 A.2d 561, 568 (Del. Ch.1998).

(FN80.) *Saito v. McKesson HBOC, Inc.*, 2001 Del. Ch. LEXIS 96 at *4 (Del. Ch. July 10, 2001).

(FN81.) *Lee v. Engle*, 1995 Del. Ch. LEXIS 149 at *11 (Del. Ch. Dec. 15, 1995).

(FN82.) *Id.* at *12.

(FN83.) *Grimes*, 724 A.2d at 570.

(FN84.) The Agenda dated 1/27/99 on the Fourth Privilege Log is not work product because it was created before the events leading to the litigation occurred. This document, however, is still protected under the attorney-client privilege.

© 2006 Thomson/West. No claim to original U.S. Govt. works.